912 A.2d 213

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Daniel MEALS, Appellee.**

**No. 58 MAP 2005.**

Supreme Court of Pennsylvania.

Argued Dec. 7, 2005.

Decided Dec. 27, 2006.

James M. Reeder, Esq., David Everett Cook, Esq., H. Stanley Rebert, for Commonwealth of Pennsylvania.

Bruce Piersoll Blocher, Esq., James Brian Rader, Esq., York, for Daniel Meals.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice CASTILLE.

The issue on appeal is the proper role of an appellate court in reviewing a sentencing court's classification of a criminal offender as a sexually violent predator ("SVP") under Megan's Law II.[1] We find that the Superior Court erred in reweighing the SVP evidence presented to the trial court, rather than simply assessing the legal sufficiency of the proof respecting SVP status accepted by the trial court, and further erred in requiring greater proof than is required by the statute. Accordingly, we reverse the order below and reinstate the trial court's SVP determination.

Appellee was charged in separate criminal complaints in York County arising from his sexual assault upon two children, both daughters of his then live-in girlfriend. With respect to the older child, who was thirteen at the time of appellee's assaults in September and October of 1999, appellee was charged with indecent assault,[2] attempt to commit aggravated indecent assault,[3] and involuntary deviate sexual intercourse.[4] Appellee's assaults of the child included placing his hand upon her genitals while she was sleeping and, on another occasion, pulling her shorts and underwear down to expose her genitals and then performing oral sex upon her, which awoke the child. The younger child was nine years-old in August of 2000, the time of the assaults which formed the basis for the second set of charges. Appellee was charged with involuntary deviate sexual intercourse,[5] aggravated inde-

1. Act of May 10, 2000, P.L. 74, No. 18 (as amended), 42 Pa.C.S. § 9791 *et seq.*

2. 18 Pa.C.S. § 3126(a)(1), (4) and (8).

3. 18 Pa.C.S. § 3125.

4. 18 Pa.C.S. § 3123(a)(3) and (7).

5. 18 Pa.C.S. § 3123(a)(6).

cent assault,[6] indecent assault[7] and corruption of minors.[8] Appellee's ongoing assault on the younger child included fondling her genitals, attempted digital penetration of her vagina and ejaculating upon her. Appellee was 32–33 years-old at the relevant times. On October 29, 2001, appellee entered a negotiated plea of guilty to all of the charges in exchange for an agreement that he be sentenced to an aggregate term of imprisonment of six to fourteen years. The trial court, the Honorable Michael J. Brillhart, accepted the pleas and then postponed sentencing to permit appellee to undergo evaluation by the Sexual Offender Assessment Board ("Board") pursuant to Megan's Law II.

In January of 2002, Gregory Loop, a member of the Board, prepared a written assessment of appellee, which concluded that appellee met the criteria in Megan's Law II to warrant classification as an SVP. Loop noted that appellee had displayed an ongoing sexual interest in both of his minor victims while, at the same time, displaying no sexual interest in their mother; and that he threatened the younger child that he would harm her mother if she reported the assaults. Loop concluded that appellee had a mental abnormality or personality disorder, *i.e.*, pedophilia, as evidenced by his sustained sexual attraction to the child victims and his acting upon that attraction. With respect to the statutory question of predatory behavior, Loop noted that appellee appeared to maintain his relationship with the children in order to assault them sexually, which supported a finding of predatory behavior.

The Commonwealth then petitioned the trial court to declare appellee an SVP. At a hearing on February 28, 2002, Loop testified and his written report was admitted into evidence. Loop testified that he had a Master's degree in counseling and specialized training in the treatment and assessment of sexual offenders. In the prior eight years, he had provided outpatient treatment to sexual offenders, as well as providing treatment and supervision of an in-home program.

6. 18 Pa.C.S. § 3125(7).

7. 18 Pa.C.S. § 3126(a)(7).

8. 18 Pa.C.S. § 6301(a).

Loop became a member of the Board in September of 2000 and had performed eighteen SVP assessments prior to his assessment of appellee; in approximately one quarter of those cases, he had found the offender to be an SVP. Loop testified that he performed his evaluation of appellee in accordance with Section 9795.4 of Megan's Law II. That Section directs that the Board, in order to facilitate SVP assessments, establish standards for evaluations and for the evaluators who conduct the assessments. The Section further provides that:

An assessment shall include, but not be limited to, an examination of the following:

(1) Facts of the current offense, including:

(i) Whether the offense involved multiple victims.

(ii) Whether the individual exceeded the means necessary to achieve the offense.

(iii) The nature of the sexual contact with the victim.

(iv) Relationship of the individual to the victim.

(v) Age of the victim.

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.

(vii) The mental capacity of the victim.

(2) Prior offense history, including:

(i) The individual's prior criminal record.

(ii) Whether the individual completed any prior sentences.

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age of the individual.

(ii) Use of illegal drugs by the individual.

(iii) Any mental illness, mental disability or mental abnormality.

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

*Id.*

In his testimony and report, Loop stressed the following factors as significant to his opinion that appellee satisfied the criteria for SVP classification: (1) appellee committed offenses against two young females, aged 9 and 13; (2) the assaults included improper touching that progressed to include attempted digital penetration and eventually oral to genital contact; (3) appellee threatened harm to the victims' mother if the younger victim did not submit to the assaults or if she reported them; and (4) appellee was opportunistic, as he assaulted the older child while she was asleep, and the younger child only after her mother left for work. Loop's report and testimony also concluded that appellee met the profile for the mental abnormality of pedophilia. Loop also testified that appellee's actions were predatory in nature in that he formed and maintained a relationship with the mother of the victims in order to maintain contact with and to exploit the children sexually, and appellee had ceased having sexual relations with the mother, preferring instead to assault the children. Loop testified that his opinions that appellee had a mental abnormality or personality disorder and had engaged in predatory behavior were rendered to a reasonable degree of professional certainty. Loop's analysis and opinion were based on his review of records provided by the Assessment Board, but did not include input from appellee, who had elected not to participate in the evaluation process.

Appellee cross-examined Loop at length, but presented no evidence of his own countering the propriety of the SVP classification. During cross-examination, Loop noted that one important factor in the SVP determination is the risk of reoffense and that appellee's pedophilia was significant because "pedophilia is highly related to a risk to reoffend." While acknowledging that treatment of pedophilia could reduce the risk of re-offense, Loop explained that it still would not make the offender less of a risk than the general population and that

"is why they're at greater risk to reoffend." N.T. 2/28/2002, 23. Asked to explain the statutory term "mental abnormality," Loop testified that "[i]t would be those behaviors as well as personal disorders that would be pulled together in manuals such as the DSM–4[ 9] that we rely upon for making a determination whether or not a person has a disorder or not, as it relates to their [sic] behavior." *Id.* at 36. At the conclusion of Loop's testimony, the trial court found that appellee satisfied the criteria for classification as an SVP. The trial court discussed the factors in Section 9795.4(b), related Loop's testimony to those factors, and concluded as follows:

> We conclude on the basis of the records as presented that [appellee] should be and we do classify him as a sexually violent predator based upon the foregoing determination that [appellee] meets the criteria for pedophilia, given the multiple assaults on these two young girls, and in the context and setting in which they were carried out, that he did so in a predatory fashion based upon at least one of the girls being unconscious, asleep during part or portions of the assaults, and that he at least in part maintained a relationship and continued it, noting mother's absence from the home at the time in order to continue to sexually exploit and use the two children.

*Id.* at 45. The court then sentenced appellee in accordance with the plea agreement.

Appellee appealed to the Superior Court, challenging only the sufficiency of the Commonwealth's evidence to prove that he was an SVP. In a published opinion, a divided panel found merit in appellee's argument. The panel majority relied heavily upon the Superior Court's *en banc* decision in *Commonwealth v. Krouse*, 799 A.2d 835 (Pa.Super.2002), which it characterized as follows. The Commonwealth's expert in *Krouse* concluded that the defendant there had a personality disorder and was likely to reoffend, basing his opinion on published studies finding that persons who engaged in conduct similar to that of the defendant were likely to repeat it. The

9. "DSM–4" refers to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition.

*Krouse* court held that the expert's finding of a personality disorder was flawed because he assumed certain facts which were not supported in the evidence, he did not meet with the defendant, the defense expert's diagnostic tests did not indicate that the defendant had a personality disorder, and the evidence did not support the Commonwealth expert's conclusion that the defendant had engaged in "grooming behavior," *i.e.*, establishing a relationship with the child for the purpose of sexually exploiting him. In addition to finding a lack of evidentiary support for the Commonwealth expert's SVP finding, the *Krouse* court noted its belief that some of the statutory factors "weighed against" a finding that the defendant was an SVP, particularly that the offense did not involve multiple victims or force or cruelty, it was the defendant's first sexual offense, the offense did not involve alcohol or illicit drugs, and there was no evidence in the record of prior mental health problems or deviant sexual behavior. *Commonwealth v. Meals*, 842 A.2d 448, 451–52 (Pa.Super.2004).

The panel majority in the case *sub judice* then noted that here, unlike in *Krouse*, the trial court made specific factual findings respecting the "necessary elements" of a determination that an offender is an SVP. Nevertheless, the majority ultimately concluded that the Commonwealth's case "suffers from many of the same deficiencies specified in *Krouse*." First, the majority opined that many of the Section 9795.4 factors "weighed against" an SVP determination, citing the trial court's findings that appellee had no history of committing sexual offenses, he had not acted in an unusually cruel manner, he did not exceed "the means necessary to commit the offenses" and he was not under the influence of drugs or alcohol at the time of the offenses. The majority also questioned the strength of Mr. Loop's "diagnosis of pedophilia" which, in the majority's view, "seem[ed] based entirely on the age of the victims." Citing *Krouse*, the majority opined: "SVP status does not automatically apply to persons who commit sexual offenses against children" and that, if it did, it would amount to an "unconstitutional presumption." After repeating its view that "many of the § 9795.4 factors weigh

against SVP status in this case," the majority concluded that the Commonwealth failed to "meet its burden of proof as set forth in *Krouse.*" *Meals*, 842 A.2d at 453–54. Judge Stevens noted his dissent without separate opinion.

■■ This Court granted discretionary review to examine the contours of review when a challenge is raised to a trial court's SVP determination. Questions of evidentiary sufficiency present questions of law; thus, "our standard of review is de novo and our scope of review is plenary." *Commonwealth v. Sanford,* 580 Pa. 604, 863 A.2d 428, 431 (2004), citing *Commonwealth v. Weston,* 561 Pa. 199, 749 A.2d 458, 460 n. 8 (2000). In conducting sufficiency review, we must consider the evidence in the light most favorable to the Commonwealth, which prevailed upon the issue at trial. *Sanford,* 863 A.2d at 432.

Preliminarily, it is helpful to review the process by which the trial court is to determine whether an offender is an SVP. Following a defendant's conviction for an offense specified in Section 9795.1,[10] but prior to sentencing, the trial court must order the Board to assess whether the defendant is an SVP. 42 Pa.C.S. § 9795.4(a). In conducting the assessment, the assigned Board member must consider the factors set forth in Section 9795.4(b), and then provide his or her assessment to the Commonwealth within ninety days. *Id.* § 9795.4(d). Following receipt of the report, the Commonwealth may file a praecipe to schedule a hearing to determine whether the defendant is an SVP. *Id.* § 9795.4(e)(1). At that hearing, the defendant has the right to counsel, and either party may call witnesses, including expert witnesses, and cross-examine adverse witnesses. *Id.* § 9795.4(e)(2). The Commonwealth bears the burden of proving that the defendant is an SVP by clear and convincing evidence. *Id.* § 9795.4(e)(3).

Megan's Law II defines a "sexually violent predator" as "a person who has been convicted of a sexually violent offense as set forth in § 9795.1 and who is determined to be a sexually

---

**10.** Appellee's convictions included indecent assault, aggravated indecent assault and involuntary deviate sexual intercourse, which are listed offenses in Section 9795.1.

violent predator under § 9795.4 due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses." *Id.* § 9792. The statute defines "mental abnormality" as "[a] congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." *Id.* The term "predatory," in turn, is defined as "[a]n act directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization." *Id.*

The standard of proof governing the determination of SVP status, *i.e.,* "clear and convincing evidence," has been described as an "intermediate" test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt. As this Court noted in *Commonwealth v. Maldonado,* 576 Pa. 101, 838 A.2d 710 (2003):

Briefly, the function of a standard of proof is to instruct the factfinder as to the level of confidence that society believes he should have in the correctness of his conclusion; furthermore, different standards of proof reflect differences in how society believes the risk of error should be distributed as between the litigants. Thus, the most stringent standard— beyond a reasonable doubt—is applicable in criminal trials due to the gravity of the private interests affected; these interests lead to a societal judgment that, given the severe loss that occurs when an individual is erroneously convicted of a crime, the public should bear virtually the entire risk of error. The preponderance-of-the-evidence standard, by contrast, reflects a belief that the two sides should share the risk equally; for this reason, it is applicable in a civil dispute over money damages, where the parties may share an intense interest in the outcome, but the public's interest in the result is "minimal." ... The "clear and convincing"

standard falls between those two end-points of the spectrum; it is typically defined as follows:

> The clear and convincing standard requires evidence that is "so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in] issue."

*Id.* at 714 (citations omitted) (upholding standard against due process challenge).

■ The Commonwealth, as appellant, argues that it proved that appellee was an SVP by clear and convincing evidence and that, in overturning the trial court's judgment, the Superior Court panel majority impermissibly substituted its judgment for that of the trial court. The Commonwealth contends that Loop's testimony demonstrated that (1) appellee met the criteria for the mental abnormality or personality disorder of pedophilia in that his sexual abuse of the child victims extended over a period of time exceeding six months; and (2) he acted in a predatory fashion by maintaining a relationship with his victims' mother in order to provide himself the opportunity to abuse the children.[11] According to the Commonwealth, the trial court's acceptance of Loop's testimony on this controlling two-part inquiry should have ended the Superior Court's inquiry. Instead, the Commonwealth asserts, the panel majority impermissibly re-weighed Loop's testimony to determine whether it agreed with Loop's conclusions and the findings of the trial court, which were based upon those conclusions.

The Commonwealth argues further that, by reweighing Loop's testimony, the panel majority deviated from the established standard of review, which required the court to accept

---

11. The Commonwealth cites to the DSM–IV, listing the criteria for the diagnosis of pedophilia, which include: sexual activity by an individual at least 16 years of age and at least 5 years older than the prepubescent child or children involved, with the children generally being age 13 or younger; the sexual activity occurs over a period of at least six months; and the sexual behavior causes clinically significant distress or impairment in social, occupational or other areas of functioning. Brief for Appellant, 13 n. 2, citing *DSM–IV,* at 528. Appellee responds that the Commonwealth's reliance on the DSM–IV criteria is improper because that criteria was "not made part of the record." Brief for Appellee, 13.

the evidence in the light most favorable to the Commonwealth. The Commonwealth also argues that the majority's reliance on *Krouse* was misplaced because, in that case, the trial court failed to articulate specific findings of fact on the record, a circumstance which led the *Krouse* court to hold that its review was not limited to a determination of whether the sentencing court's factual findings were supported by the record, but instead, its review encompassed the entire record. Here, by contrast, the trial court set forth specific findings of fact. Where the sentencing court provides such specific factual findings, the Commonwealth argues, an appellate court cannot second-guess the conclusions of the expert witness whose testimony was accepted below. Had the Superior Court applied the appropriate level of deference to the trial court's findings, the Commonwealth concludes, it would have determined that the Commonwealth met its burden of proving that appellee is an SVP by clear and convincing evidence.

Appellee responds by disputing the Commonwealth's argument that the evidence supported a finding that he met the criteria for pedophilia. Appellee notes that Loop only testified that, "[b]ased on the behavior that was reported over time, that behavior being the sexual engagement of children, it appeared that [appellee] would present in a similar manner as those diagnosed with pedophilia." N.T. 2/28/02 at 18. Appellee argues that this statement, coupled with the evidence that appellee sexually assaulted one of the girls for two months in 1999 and the other in August of 2000, but with no evidence of any assaults in the nine intervening months, does not support a finding of pedophilia. Appellee also argues that the trial court's analysis was deficient because it considered only those factors weighing in favor of SVP status, and failed to weigh countervailing factors. Thus, in appellee's view, the Superior Court properly concluded that the Commonwealth's evidence was deficient. According to appellee, the Superior Court did not reweigh the evidence but properly drew a different legal conclusion from the trial court's findings of fact.

To the extent the Superior Court panel majority approached its task by comparing and "weighing" Section 9795.4 factors

not present here—*i.e.*, that appellee had no history of committing sexual offenses, 42 Pa.C.S. § 9795.4(b)(2), he did not exceed "the means necessary to achieve the offenses," *id.* § 9795.4(b)(1)(ii), he did not display "unusual cruelty" during commission of the crimes, *id.* § 9795.4(b)(1)(vi), and he was not under the influence of drugs or alcohol at the time of the offenses, *id.* § 9795.4(b)(3)(ii)—against those circumstances whose presence the trial court cited as supporting its SVP finding, the panel majority plainly erred. The error in the majority's "comparative" approach is not merely a function of the limitation inherent in appellate sufficiency review, which should have confined the court to an assessment of those factors which supported the SVP finding, but also a function of the panel's failure to appreciate the testimony below and the practical operation of the statute, as revealed by that testimony.

On cross-examination of Mr. Loop at the SVP hearing, appellee's able counsel attempted to undermine the expert's conclusions by stressing Section 9795.4(b) factors the expert had noted were not present, or were unremarkable, in appellee's case. The defense point, of course, was to suggest to the trial court that the absence of statutory factors weighed against any SVP finding. But Loop explained that the SVP assessment does not work in the "A or B" manner the defense suggested, stressing that the statute is not a mere checklist where one simply totals and compares the presence or absence of designated factors. Instead, Loop testified, the presence or absence of certain factors may simply suggest the presence, or absence, of one or more particular types of abnormalities; thus, there is, in his words, "more than one pathway to an issue of pathology." The cross-examination of Loop contains the following, extended explanation of the manner in which the expert understood his statutory task:

Q. [appellee's counsel]One of the criteria that you testified to in assessing whether someone is [an SVP] is whether the individual exceeded the means necessary to achieve the offense.

A. [Mr. Loop] That's correct.

Q. And you testified that in this case, [appellee] did not exceed the means necessary.

A. That's correct.

Q. Is that an indicat[o]r then that—does that put him closer towards the predatory side or does it take him away from the predatory side?

A. It's one of the factors that needs to be evaluated for a different reason altogether, in that it's not an A or B kind of situation, it's—let me explain it this way.

If, in a review of systems, I said, "Your doctor said your heart is in good shape, but you have brain cancer," you'd go, "Gee, this isn't a good thing." The fact that you have a healthy heart doesn't really matter. Under those circumstances, you're concerned about the brain cancer because it's more than one pathway to an issue of pathology.

In this particular instance, the reason that we're looking for the instrumentality of violence is, also of concern is whether or not someone would meet the criteria for something like antisocial personality disorders or psychopathology, which is evidenced often by excessive force during the commission of crimes due to the fact that there is pleasure derived in the infliction of pain, and so that would be a separate diagnostic criteria I would be looking at under mental abnormality, not necessarily indicative of whether or not the behavior was predatory or not.

Q. Would a predator under this [A]ct be more likely to exceed the means necessary to achieve the offense?

A. They're not related.

Q. Why aren't they related? This is a criteria [sic] in determining whether someone is a sexually violent predator, isn't it?

A. It is one of the things to consider. It's not a checklist where you go down and check them all off and say if they meet five out of six, they're a predator.

If a person evidences behavior such as psychopathology, and let's suggest that it was measured from a review of records using the psychopathic checklist developed by Bob

Hare, which is highly reliable, and he was a sexual offender, the research suggests that individuals who match these kinds of profiles are most likely to reoffend sexually.

However, if he had not violated the law and committed a sexual offense, but was high on the list still in terms of psychopathology, he would not necessarily be at high risk to reoffend sexually.

So there is [sic] multiple pathways, and it's not as though what is being stated is that the issue of additional cruelty necessarily makes one more predatory. It just means there's an abnormal [sic] because they enjoy cruelty, and that that needs to be assessed.

In this case, I did not find that he was engaging in excessive cruelty. It was not a factor pro or against.

Q. Well, I didn't get to that criteria involving cruelty yet. I was asking about one of the criteria is whether the individual exceeded the means necessary to achieve the offense. What does that mean to you?

A. That he would engage in violence that would be beyond instrumental.

Q. Could he go—are the means always going to be violence?

A. No.

Q. In order to obtain or engage in this offense?

A. Not necessarily.

Q. What other means would someone engage in?

A. Bribery, threats, manipulation.

N.T. 2/28/2002, 26–29.

Appellee's counsel went on to examine the factor of appellee's "relationship to the victim," *see* 42 Pa.C.S. § 9795.4(b)(1)(iv), seeking to impeach Loop with the fact that he had not explored such matters as the length of time appellee was with the children, and he had not interviewed the victims or their mother to determine "what other type of relationship" appellee may have had with the children. But, Loop explained that, for his purposes, what was significant

"was whether or not [appellee] was engaging in this relationship for the purpose of engaging the children sexually or not" and that, from the information he had, it was apparent that the purpose of his relationship with the children indeed was to engage them sexually. Loop noted that, "I'm not sure that engaging in other activities [besides the sexual contact with the children] would preclude the fact that he was wanting to be sexual with this nine year old child." N.T. 2/28/2002, 29–32.

Counsel's cross-examination concerning the statutory factor of the mental capacity of the victims, *see* 42 Pa.C.S. § 9795.4(b)(1)(vii), resulted in a similar exchange. Counsel elicited that Mr. Loop had no specific information concerning this factor, and thus Loop did not know whether either child had a diminished capacity. But, Loop explained, the fact of diminished capacity, if it existed, "would only add to my concern, not diminish it" since it "would suggest that they were more susceptible." N.T. 2/28/2002, 32–33.

■ The testimony in this case refutes the notion, accepted both by the panel majority below and by the *en banc* court in *Krouse,* that the Section 9795.4(b) factors operate as a checklist where each factor weighs, in some absolute fashion, either for or against an SVP classification. Of course, appellee's counsel was free to argue to the trial court that the expert's responses to these lines of examination were not credible or were unpersuasive, and that the expert's opinions and ultimate conclusion should therefore be rejected. However, once the court made its SVP determination, the relevance of the cross-examination for purposes of appellate sufficiency review is a very different matter. The appellate task requires construing the evidence in the light most favorable to the party which prevailed before the factfinder, and in this case, that evidence includes the expert's explanations concerning, for example, the significance of appellee not exceeding the means necessary to abuse a nine year-old and a thirteen year-old, and the absence of "unusual cruelty." Thus, the factors the panel majority cited as "weighing against SVP status" in fact do not call into question the sentencing court's finding in this case. The Superior Court stepped beyond its authority when it re-

weighed the evidence, giving more weight to "absent" factors than to those found and relied upon by the trial court, and ignoring the Commonwealth's expert's explanation of the relevance of the absent factors. The task of the Superior Court is one of review, and not of weighing and assessing evidence in the first instance.[12]

 Viewed under the proper standard, we have no difficulty in finding that the evidence was sufficient to support the trial court's classification of appellee as an SVP. Mr. Loop identified pedophilia as appellee's "mental abnormality or personality disorder," noting that appellee's "sustained" sexual interest in multiple children over a period of time was consistent with pedophilia. The evidence supported that appellee's sexual interest in the children extended over a significant period of time, as his multiple attacks on the younger child occurred more than nine months after his multiple attacks on the older child. Moreover, in his report, Loop noted that appellee's sexual contact with the younger child appeared to have been sustained over a period greater than six months, as she reported that he "had been touching her for some time," both before and after a period during which appellee was incarcerated. The child told investigators that, before appellee went to jail, he touched her vaginal area and digitally penetrated her vagina; when he returned from jail, the touching resumed. Loop Assessment, January 7, 2002 at unnumbered p. 3.

With respect to the question of whether appellee's abnormality/disorder resulted in a predisposition to commit criminal sexual acts, Loop opined that "pedophilia is highly related to a risk to reoffend" and that, although there are a number of existing "treatments" for pedophilia, those treatments at best "would lessen the risk for that person, but would not necessarily make them [sic] less at risk than the general population, which is why they're [sic] at greater risk to reoffend." N.T. 2/28/2002, 23. With respect to "predatory" behavior, Loop

---

12. To the extent the decision in *Krouse* conflicts with the approach we outline in the case *sub judice,* this Court's approach controls and *Krouse* is disapproved.

stressed both in his report and in his testimony that appellee's conduct in assaulting the older child while she was asleep, and in maintaining a relationship with the mother for the apparent purpose of sexually exploiting her children, was predatory. Finally, Loop noted that his conclusions were rendered to a reasonable degree of professional certainty. Because the expert's report and testimony support the trial court's finding that appellee was an SVP, there is no basis for granting sufficiency relief.

The other deficiency that the Superior Court panel majority found in the Commonwealth's proof—that Loop's "diagnosis of pedophilia" was problematic because it "seems based entirely on the age of the victims"—reflects a related misapprehension of the court's reviewing role. The basis for the majority's dismissal of the expert's diagnosis is flawed as a matter of fact and as a matter of law. As a matter of fact, Loop cited to more than the age of the victims in support of his opinion that appellee was a pedophile; he stressed also that multiple child victims were involved and that the offenses were committed over a period of time.. The facts fully supported these points. The majority's discounting of the finding of pedophilia is also troubling because it ignores that Loop's expert opinion—that, to a reasonable degree of professional certainty, appellee was a pedophile—**itself** was evidence. To the extent appellee felt that the expert's "diagnosis" was not fully explained, did not square with accepted analyses of the disorder, or was simply erroneous, he certainly was free to introduce evidence to that effect and/or to argue to the factfinder that the Commonwealth's expert's conclusions should be discounted or ignored.[13] But that argument would affect the weight, and not the sufficiency, of the expert's evidence. *See, e.g., Commonwealth v. Davido*, 582 Pa. 52, 868 A.2d 431, 442 n. 18 (2005); *cf. McMahon v. Young*, 442 Pa. 484, 276 A.2d 534, 535 (1971)

**13.** In point of fact, although appellee's counsel examined Loop on his conclusion respecting pedophilia, appellee did not introduce any evidence at the hearing below which called into question the accuracy of his diagnosis. Thus, for example, appellee did not produce an expert of his own, nor did he cite to any authority which would have suggested to the trial judge that the expert's finding respecting pedophilia was deficient.

("The opinion of a medical expert is evidence") (explaining why expert testimony must be expressed to requisite degree of certainty).

 Even laying aside that Loop testified to more than the age of the victims, and that the expert's opinion itself was evidence, the panel majority's analysis is problematic as a matter of law because there is no valid basis, at least on the record and arguments forwarded here, for its assumption that an expert's diagnosis of pedophilia requires more than proof of sexual assaults upon children. The majority justified its added burden by stating that an "unconstitutional presumption" of SVP status otherwise would arise. But, this conclusion is flawed for two reasons. First, the conclusion misconstrues the operation of the statute. The statute: (a) affords the Commonwealth no presumption, but instead places a burden upon it to prove SVP status to the trial court by clear and convincing evidence; (b) allows the defense to challenge the Commonwealth's evidence and to present its own evidence; and (c) permits the trial court to reject the Commonwealth's evidence. Second, proof of a mental abnormality or personality disorder is not sufficient in itself to prove SVP status, much less a presumption of SVP status. Instead, there must also be proof concerning predatory behavior. Thus, in addition to improperly "weighing" "absent" statutory factors against those found by the trial court to upset an SVP determination, the panel majority erred in diminishing the effect of the evidence produced by the Commonwealth and relied upon by the trial court, by insisting upon a higher standard not required by the statute.[14]

14. The error in the Superior Court's reasoning in this case is similar to the error committed in *Commonwealth v. Sanford,* 580 Pa. 604, 863 A.2d 428 (2004). In *Sanford,* the Superior Court determined that certain of the Commonwealth's SVP evidence was inadmissible and that, absent that evidence, the proof of SVP status was insufficient. This Court held that it was error to review the sufficiency of the SVP evidence upon such a diminished record, stating:

> [T]o the extent that the Superior Court disregarded [the expert's] testimony because it found the testimony to be inadmissible, it erred. In conducting its review of this claim, the lower court should have examined all the evidence adduced by the Commonwealth, "without

Finally, we note that we need not resolve the dispute between the parties concerning whether reference to the DSM–IV, as a source for the criteria for assessing pedophilia, is appropriate.[15] In his testimony, Mr. Loop stated that assessors rely upon that manual in determining whether a person suffers from a mental abnormality. However, Loop did not specifically state that he relied upon the manual in making his assessment in this case and, as appellee accurately notes, the diagnostic criteria for pedophilia listed in the DSM–IV were not referred to in the record below. We need not decide, and hence do not decide, the relevance of the DSM–IV criteria in determining the required proof, or sufficiency of proof, of a diagnosis of pedophilia in determining SVP status. *But cf. Commonwealth v. Dengler*, 586 Pa. 54, 890 A.2d 372, 383 (2005) ("The statute does not require proof of a standard of diagnosis that is commonly found and/or accepted in a mental health diagnostic paradigm"). Neither the Commonwealth nor appellee argued below that the statute incorporates and requires such a standard and/or that the sufficiency of the proof to support a diagnosis of pedophilia depends upon the

consideration as to the admissibility of that evidence." [*Commonwealth v. Smith*, 523 Pa. 577, 568 A.2d 600, 603 (1989).] Thus, it should have viewed all of the evidence introduced at the hearing—including the entirety of [the expert's] testimony—in the light most favorable to the Commonwealth to determine whether this corpus of evidence was sufficient to sustain the SVP designation.

*Id.* at 432. Although the issue presented in this appeal is different from that in *Sanford*, the case is instructive because here, no less than in *Sanford*, the Superior Court failed to afford the prevailing party below the full effect of its having prevailed upon an issue in the trial court.

15. The DSM–IV outlines the disorder of pedophilia in detail and then sets forth the diagnostic criteria as follows:

Diagnostic criteria for Pedophilia

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other areas of functioning.

C. The person is at least age 16 years and at least 5 years older than the child or children in Criterion A.

DSM–IV at 528.

degree to which the evidence satisfies that criteria. Instead, the issue preserved below, and argued in this Court, simply involves the sufficiency of the proof under the statute itself and, for the reasons we have stated above, we conclude that the evidence was sufficient to support the trial court's determination.

Accordingly, the decision of the Superior Court is reversed and the trial court's SVP determination is reinstated.

Justice NEWMAN and Justice SAYLOR and EAKIN join the opinion.

Former Justice NIGRO did not participate in the consideration or decision of this matter.

Chief Justice CAPPY files a concurring opinion in which Mr. Justice BAER joins.

Chief Justice CAPPY, concurring.

I join the Majority Opinion, with the understanding that in this case, the test for conducting appellate review of the sufficiency of the evidence is whether the evidence and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as the prevailing party, was sufficient to establish all of the elements of sexually violent predator ("SVP") status under 42 Pa.C.S. 9792, *see Commonwealth v. Frey*, 588 Pa. 326, 904 A.2d 866, 871 (2006), and that Mr. Loop's testimony as to the process he followed in examining the factors listed in 42 Pa.C.S. 9795.4(b) for assessing SVP status represents nothing more than his own notion of the evaluation the statute required of him. In the present case, this Court was not asked to construe 42 Pa.C.S. 9795.4(b). That matter remains for another day.

Justice BAER joins this concurring opinion.