J-S07007-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| JOSHUA STEVEN PERRY | |
| Appellant | No. 585 MDA 2016 |

Appeal from the Judgment of Sentence October 27, 2015
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0007652-2014

BEFORE:  BOWES, LAZARUS AND MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED MAY 10, 2017**

Joshua Perry appeals from the judgment of sentence of sixty-six to 132 months incarceration imposed following his convictions for aggravated assault and endangering the welfare of a child.  We affirm.

The following facts were presented at trial.  The victim in this case is L.L., an eighteen-month-old child.  On October 20, 2014, Appellant, who was dating L.L.'s mother K.M., watched the child while K.M. was at work.  Appellant told K.M. via text message that L.L. jumped out of his crib and fell.  N.T., 9/8-10/15, at 106.  This incident occurred while K.M.'s grandfather was present in the household, albeit in another room.  *Id*. at 121.  K.M. lowered the mattress level in the crib to prevent future incidents.  *Id*. at 129.

On October 23, 2014, K.M. took L.L. to a previously-scheduled wellness check. The pediatrician, Dr. James Sioma, testified that the mother's primary concern was L.L.'s biting and scratching behaviors. *Id*. at 175. L.L.'s vital signs were normal and Dr. Sioma did not note any other issues. *Id*. at 177. L.L. was smiling, playful, alert, and active. *Id*. at 178.

On October 24, 2014, L.L.'s father took custody for the weekend. *Id*. at 144-47. The father testified that the child did not suffer any falls or other injuries, and was generally normal. *Id*. at 146. On October 26, 2014, K.M. regained custody of L.L. *Id*. at 147. That evening, she took the child to a family birthday party where he played, ate cake, and showed no signs of distress. *Id*. at 109.

On October 28, 2014, K.M. left L.L. in Appellant's care while she went to work.[1] No one else was in the home. *Id*. at 111. K.M. sent text messages throughout the morning, with Appellant replying at approximately 11:00 a.m., stating that he was unpacking and moving things. *Id*. at 112. At approximately 2:19 p.m., Appellant began calling. At 2:30 p.m., K.M. returned the call. Appellant told her that she needed to get to the hospital. *Id*. at 112. She learned that Appellant had taken L.L. to the emergency room at Holy Spirit Hospital in his vehicle instead of calling for emergency services.

---

[1] On or about October 23, 2014, K.M. and Appellant moved in together.

Dr. Salvatore Alfano, the treating physician, testified that L.L. presented in serious condition and required resuscitation. Appellant told Dr. Alfano that he had put L.L. down for a nap and checked on him thirty minutes later, whereupon he saw that the child was unresponsive. *Id*. at 77. Dr. Alfano sent L.L. for a CAT scan, which revealed a subdural hematoma and bleeding of the brain. *Id*. L.L. was transferred to Hershey Medical Center Pediatric Hospital.

The local police department was alerted and Officer Scott Rood, an officer located in the hospital's jurisdiction of Cumberland County, responded and spoke to Appellant. *Id*. at 85. Appellant told Officer Rood that he put L.L. down for a nap between 1:30 and 2:00 p.m., and woke him up fifteen to forty-five minutes later in order to go outside and play. *Id*. at 87. Appellant stated that he put L.L. on the floor and turned to get a diaper; when he turned around he saw that L.L. was unconscious. He then took L.L. to the hospital. *Id*. at 88. During the conversation, Officer Rood learned that the injury had occurred in York County and called their communication center.

Detective William Haller, of the Northern York County Regional Police, went to the hospital and spoke to Appellant, who again indicated that he had put L.L. in his crib for a nap around 1:45 p.m. *Id*. at 186. Appellant stated that he woke the child about fifteen minutes later in order to take him outside to play. *Id*. Appellant gave the detective his cell phone and

authorized a search of the residence. Nothing of evidentiary value was recovered. *Id*. at 191.

Dr. Kent Hymel, a child abuse pediatrician at Hershey Medical Center, was asked to consult for a possible abuse diagnosis and later testified as an expert witness. He opined that the child's injuries could not have resulted from a fall from the crib. *Id*. at 228. Dr. Hymel reached this conclusion after reviewing L.L.'s injuries, which included a subdural hemorrhage, multilayered retinal hemorrhaging, and extensive swelling. The swelling required the removal of a bone flap to reduce the pressure. *Id*. at 227.

Dr. Hymel also offered testimony regarding the expected onset of symptoms associated with the type of traumatic injuries present in L.L.'s brain. Dr. Hymel emphasized the clinical signs of distress exhibited by L.L.:

> [H]e did stop breathing and needed intubation and his heart rate stopped. That tells me he had distortions of deep structures at the base of the brain near where the spinal cord joins the base of the brain. The only – in the absence of penetrating trauma like a bullet going down to those structures, the only mechanism for closed head trauma, meaning nonpenetrating head trauma, would be head trauma that puts the head into violent motion on the neck.

*Id*. at 231. This led Dr. Hymel to opine that L.L. was injured "very shortly, perhaps seconds, minutes before he became clearly and persistently ill. That is the expectation when we see such definitive signs of moderate or severe or even life-threatening injury. They are not going to be normal thereafter." *Id*. at 237. The severity of L.L.'s injuries led Dr. Hymel to

reject the notion that L.L.'s clinical signs of distress could be a delayed onset of symptoms from an earlier traumatic injury. "If you are going to suffer a head injury from a fall and later it's going to cause you to nearly die, you are not going to be completely asymptomatic between the time of that fall and later when you deteriorate." *Id*. at 229.

This expert testimony was countered by Appellant's expert, Dr. Robert Zimmerman, the Chief of Pediatric Neuroradiology at Children's Hospital of Philadelphia. *Id*. at 294. He agreed that the injury was caused by trauma. *Id*. at 317. Contrary to Dr. Hymel, Dr. Zimmerman opined that the injuries could have resulted from an accident. *Id*. at 312. He also stated that Dr. Hymel's calculation of the timing was not necessarily correct. *Id*. at 307-08. He described to the jury his review of multiple brain scans which were progressively taken during the course of L.L.'s treatment. Based on this review, he opined that whatever traumatic event caused L.L.'s injuries could have occurred anywhere from one day to three days before the 28th. *Id*. at 316. With respect to the onset of symptoms, Dr. Zimmerman stated that an eighteen-month-old child could exhibit a period of lucid behavior or what would appear to be asymptomatic activity following the traumatic event. *Id*. at 306. However, he conceded that lucid intervals are primarily seen in cases where the hemorrhage was epidural, not subdural as in L.L.'s case. *Id*. at 317.

The jury convicted Appellant of aggravated assault and endangering the welfare of a child. Appellant timely filed post-sentence motions, which were ultimately denied on April 1, 2016. *See* Pa.R.Crim.P. 720(B)(3)(b). The case is now ready for our review. Appellant raises two issues.

1. The Commonwealth presented insufficient evidence to convict Appellant beyond a reasonable doubt of aggravated assault and endangering the welfare of [a] child, because the jury could only speculate among conflicting inferences regarding Appellant's guilt given the testimony, including the medical testimony, presented.

2. The trial court abused its discretion in failing to grant a new trial because the jury's verdict is against the weight of the evidence and shocks the conscience given that the evidence was so weak and inconclusive that it required the jury to speculate about Appellant's level of culpability, if any, and how the injuries to the minor child occurred.

Appellant's brief at 5.

Appellant's first issue concerns the sufficiency of evidence to sustain the convictions at both charges. Our standard of review is well-settled:

[W]e examine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, support the jury's finding of all the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence.

*Commonwealth v. Doughty*, 126 A.3d 951, 958 (Pa. 2015). Moreover,

the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. The Commonwealth

may sustain its burden by means of wholly circumstantial evidence.

**Commonwealth v. Lynch**, 72 A.3d 706, 708 (Pa.Super. 2013) (*en banc*) (internal citations and quotation marks omitted).

Appellant was convicted of aggravated assault (serious bodily injury) and endangering welfare of a child. To prove aggravated assault, the Commonwealth must show that Appellant "attempt[ed] to cause serious bodily injury to another, or cause[d] such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S. § 2702(a)(1). To establish endangering the welfare of a child, the Commonwealth must establish that Appellant supervised L.L. and "knowingly endanger[ed] the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a)(1).

Appellant's challenge to both convictions rests on the same point: that the Commonwealth failed to present sufficient evidence of causation. His argument is that nothing linked Appellant to L.L.'s injuries other than the sheer speculation supplied by expert testimony. Primarily, Appellant notes that Dr. Hymel's testimony "merely speculates given his expertise in child abuse that since an 'explanation was never provided' about the injury, the only conclusion must be that it was the result of abuse. However, the absence of explanation does not prove the conclusion of child abuse without the actual existence of evidence." Appellant's brief at 22.

We disagree. Crediting the Commonwealth's expert testimony, as we must when reviewing a challenge to the sufficiency of the evidence, we accept that an accidental cause for the injuries was eliminated. Thus, the only remaining explanation is an intentional act. Significantly, the Commonwealth's expert addressed the relationship between the severity of L.L.'s injuries and when the traumatic event must have occurred. The Commonwealth is entitled to prove its case through circumstantial evidence, and, accepting Dr. Hymel's testimony regarding timing as true, the injury occurred "very shortly, perhaps seconds, minutes before he became clearly and persistently ill." N.T., 9/8-10/15, at 237. "The opinion of a medical expert witness rendered to the requisite degree of certainty is itself evidence." *Commonwealth v. Martin*, 101 A.3d 706, 729 (Pa. 2014) (citing *Commonwealth v. Meals*, 912 A.2d 213, 223-24 (Pa. 2006)). Additionally, L.L.'s mother testified that she left for work at 5:30 a.m. and Appellant was the only person in the house. *Id*. at 111. Thus, Appellant was the only person who could have inflicted the injuries during the relevant timeframe. Furthermore, Dr. Hymel noted that L.L.'s ear showed signs of bruising, which he deemed significant since children rarely, if ever, bruise their ear in an accidental fall. *Id*. at 233-34. Taken together, this evidence serves to establish the necessary causal link. *See also Commonwealth v. Passarelli*, 789 A.2d 708 (Pa.Super. 2001), *affirmed*, 825 A.2d 628 (Pa.

2003) (reviewing sufficiency of evidence where Commonwealth and defense offered competing expert testimony regarding shaken baby syndrome).

Appellant's response to the timing issue is that the "testimony does not address the possibility that the child either accidentally, or intentionally due to the recent history of anxiety, smacked his head into the side of his crib." Appellant's brief at 21. Contrary to this assertion, Dr. Hymel did address this point and rejected the theory that L.L.'s injury was self-inflicted.

Q. And could [L.L.] have inflicted this [injury] on himself?

A. Let's presume – I can't think how [L.L.] would have gross motor skills to put himself in a position of doing this to himself. I guess it's conceivable an 18-month-old could fall from a third story window or a much more severe fall could maybe approach this level of severity. But someone would have been there to pick him up.

N.T., 9/8-10/15, at 230.

Finally, Appellant notes that Dr. Hymel acknowledged on cross-examination that he was unaware that the child vomited after falling from his crib on October 20, a fact admitted by the child's mother and noted in Dr. Alfano's medical records. *Id*. at 81. Appellant points out that Dr. Hymel listed vomiting as one of the symptoms that can accompany head injury. *Id*. at 229. Appellant suggests that this proves L.L. was not wholly asymptomatic and therefore undercuts the expert opinion. However, Dr. Hymel never indicated that learning this fact changed his opinion in any way,

and Appellant did not ask him that question.[2]  Thus, the evidence was sufficient to support the jury's determination that Appellant intentionally inflicted L.L.'s injuries.  Since causation is the only aspect of the convictions that Appellant challenges, we reject his sufficiency challenges.

We now examine Appellant's second claim, which attacks the trial court's denial of his weight of the evidence claim.  Our standard of review is well-settled.  We review the exercise of the trial court's discretion in ruling on the weight claim, not the underlying question of whether the verdict is against the weight of the evidence.  ***Commonwealth v. Leatherby***, 116 A.3d 73, 82 (Pa.Super. 2015) (citing ***Commonwealth v. Brown***, 23 A.3d 544, 558 (Pa.Super. 2011)).  The trial court should grant a new trial "only when the verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail."  ***Commonwealth v. Rayner***, 153 A.3d 1049, 1056 (Pa.Super. 2016) (citation omitted).  "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice."  ***Leatherby***, ***supra*** at

---

[2]  We note that Dr. Hymel stated, "I have only ever heard of children being symptomatic and some of those with **less severe trauma** may have been only mildly symptomatic, irritability, and vomiting."  N.T., 9/8-10/15, at 249-50 (emphasis added).

- 10 -

82. We can only reverse for an abuse of discretion. "Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000) (citation omitted).

Instantly, Appellant's weight argument is the same as his sufficiency argument, in that he avers the jury was required to credit his expert's testimony.

> The arguments and reasons outlined in the [sufficiency of the evidence] section are equally applicable to a weight of the evidence claim. The Commonwealth's evidence simply fails to connect the injur[y] to [Appellant]'s conduct and leaves open the possibility that the injury occurred while the child was in the custody of his biological father, or at [the] birthday party.

Appellant's brief at 26.

In *Commonwealth v. Edwards*, 903 A.2d 1139, 1148 (Pa. 2006), our Supreme Court addressed a weight claim where the appellant essentially repeated a sufficiency argument.

> In an argument subsumed within his sufficiency claim, appellant also contends that the verdicts for first-degree murder and burglary were against the weight of the evidence. Although appellant cites to the standard for reviewing a weight claim, he does not forward an argument relating to the standard. Instead, the only argument forwarded, to the extent one is made at all, is the one summarized above respecting sufficiency. Thus, appellant does not say why, or in what respect, the verdict was against the weight of the evidence.

*Id*. at 1148. The same is true here. Appellant explicitly repeats the same arguments he advanced in attacking the sufficiency of the evidence. In reviewing a weight claim, we are not required to view the evidence in the light most favorable to the verdict winner. ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (citing ***Tibbs v. Florida***, 457 U.S. 31, 38, n.11 (1982)). However, the trial judge is called upon to determine whether, "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." ***Id***. at 752.

Appellant's expert testimony does establish that the injury may have occurred at some other time. But the trial court, which sat and heard all of the evidence, did not find the jury's rejection of Dr. Zimmerman's testimony to rise to the level of shocking its own sense of justice. Since the jury was free to reject or credit such expert testimony as it saw fit, ***Martin***, ***supra***, we do not find that the trial court was manifestly unreasonable in rejecting the weight claim. Hence, we do not find the court abused its discretion.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/10/2017

- 12 -