J-S41042-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SCOTT A. GRANT | : | |
| | : | |
| Appellant | : | No. 1101 EDA 2024 |

Appeal from the Judgment of Sentence Entered August 24, 2022
In the Court of Common Pleas of Monroe County
Criminal Division at No(s):  CP-45-CR-0000461-2021


BEFORE:  MURRAY, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED APRIL 2, 2025**

Scott A. Grant ("Grant") appeals *nunc pro tunc* from the judgment of sentence imposed after a jury convicted him of indecent assault, unlawful contact with a minor, corruption of minors, and related offenses,[1] and the trial court determined he was a sexually violent predator ("SVP").  We affirm.

The trial court summarized the trial evidence as follows:

[The victim, S.F. (born in 2007),] told her mother for the first time on December 24, 2020, about incidents that had occurred between her and [Grant,] her paternal step-grandfather who was born in 1965.  S.F. [explained the delay in reporting occurred because she] had been thinking of her paternal grandmother, who[] had been diagnosed with cancer the year prior in December 2019, and had since passed away.  S.F. testified that she loved her grandmother and didn't want to say what happened to her while her grandmother was alive.

_____

[1] **See** 18 Pa.C.S.A. §§ 3126(a)(7), 6318(a)(1), (2), (4), 6301(a)(1)(i), (ii), 5903(c)(1), 4304(a)(1).

S.F. described the abuse she endured by [Grant as] starting in 2012[,] when she was 5 years old[,] through the age of 10. She testified that every other weekend[,] she would stay at the home of her paternal grandmother and [Grant], whom she referred to as [“]Poppy Scott[”]. Going back chronologically from the first thing she remembered, S.F. testified as follows:

A. He ([Grant]) would walk . . . naked around the house.

Q. Okay, and at that time when he would walk around naked, how old were you when you first remember him doing that?

A. About 5 or 6.

Q. Okay, and when he would walk around naked when you were about 5 or 6 was anybody else in the house at that time, like in the same room or area?

A. No.

Q. And when you say naked do you mean fully naked or just like partially, what do you mean?

A. Fully naked.

Q. Alright, and would you see his private part?

A. Yes.

Q. Would he do that, was this just a one-time thing or would he do this all the time?

A. All the time.

S.F. further elaborated that [Grant], while naked, would touch her with his entire hand on her buttocks and try to kiss her. S.F. said she would sleep in the bed between her grandmother and [Grant] from age 5 to 7, and while in bed together, she recounted that [Grant] would touch his private parts. S.F. also described, "I could feel him touching me with his private parts."

S.F. testified that starting when she was 7 years of age, [Grant's] actions escalated to [Grant] touching her vaginally while in his work truck, having her watch porn with him, and seeing him masturbate. . ..

* * * *

- 2 -

S.F. testified that when she was age 8 or 10, [Grant] would also pull back the shower curtain to watch her while she was bathing. S.F. testified that she used the excuse of [Grant] and her grandmother being heavy smokers to stop her visits with them when she turned 10 years old, but she actually was uncomfortable [with Grant's] behaviors. Aside from the sleeping incidents, much of the inappropriate behavior happened when [Grant] was alone with S.F. with the grandmother absent from the house. S.F. identified [Grant] as [the] perpetrator at trial.

[]S.F.'s mother[] corroborated the frequency of S.F. sleeping over [at Grant's] house, until S.F. reached the age of 10 when S.F. told her that she didn't want to go there anymore. The mother said that she found out about the incidents between [Grant] and her daughter for the first time on December 24, 2020, when S.F. revealed what had happened. The mother texted [Grant] and wrote, among other things, that he was dead to her for what he did to her daughter. The mother then notified S.F.'s father and contacted the police.

S.F.'s description of what [Grant] did to her was partially corroborated by [Grant's] recorded words in a conversation between [Grant] and S.F.'s father. Detective Earl Ackerman testified that he had been a detective with the Pocono Township Police since 2008, and he investigated this case beginning on January 12, 2021. He said . . . S.F.[] "made several disclosures, involving inappropriate touching, exposure to pornographic material, exposure to porn, illicit acts, and identified her step-grandfather as the perpetrator[.]" . . .. [The detective] also gathered information about what [Grant] had done to S.F. in his truck.

The jury had the opportunity to hear the Commonwealth's Exhibit 4 recording between [Grant] and S.F.'s father held on January 22, 2021 and February 6, 2021. Detective Ackerman was in the room when the recordings were made. He testified that he personally heard [Grant's] admissions followed by accusations that it was S.F., a child, who had initiated the contact and that what occurred was "her idea[.]" [Grant] further gave the excuse in his own words that he had walked around the house naked and watched pornography in front of S.F. in order to "scare" her. . ..

Trial Ct. Op., 5/2/24, at 7-12 (record citations omitted).

A jury convicted Grant of the above-stated crimes, and the trial court ordered an assessment by the Sexual Offenders Assessment Board (SOAB), which Mary Muscari, Ph.D. ("Dr. Muscari") completed. Grant obtained a defense expert, Lori Feneck, LCSW ("Ms. Feneck").[2] On August 24, 2022, the trial court held an SVP hearing at which Dr. Muscari testified, and the trial court also admitted Ms. Feneck's report. The trial court designated Grant as an SVP and then sentenced him to an aggregate term of 78 to 234 months of imprisonment. The trial court notified Grant of his registration requirement under Subchapter H of the Sexual Offender Registration and Notification Act ("SORNA"), 42 Pa.C.S.A. §§ 9799.10-9799.42.

Grant did not timely file a post sentence motion, but timely filed a Post Conviction Relief Act petition, upon which the court reinstated Grant's direct appeal rights in March 2024. Grant timely appealed *nunc pro tunc*, and he and the trial court complied with Pa.R.A.P. 1925.

Grant raises the following issue for our review:

1. Whether the Commonwealth established, by clear and convincing evidence, that [Grant] possessed a mental abnormality or that . . . his engagement with the minor child was "predatory" as defined under 42 Pa.C.S.A. § 9799.12?

Grant's Brief at 2.

---

[2] Ms. Feneck stated an "actuarial risk assessment suggest[ed Grant] is a below average risk sexual offender," but added "this risk level most likely under-estimates his rise of reoffending." *See* Ex. D-1 at 4.

Grant challenges the sufficiency of the evidence underlying the trial court's SVP determination.

Challenges to the sufficiency of the evidence present questions of law, and the standard of review is *de novo*, and the scope of review plenary. **See Commonwealth v. Meals**, 912 A.2d 213, 218 (Pa. 2006); **Commonwealth v. Aumick**, 297 A.3d 770, 776 (Pa. Super. 2023) (*en banc*). In reviewing the sufficiency of the evidence, this Court does not question or reweigh the evidence. **See Meals**, 912 A.2d at 222-23. Rather, our review is limited to whether the record, when viewed in a light favorable to the Commonwealth, establishes clear and convincing evidence to sustain the trial court's finding that an individual meets the statutory definition of an SVP. **See id**. "[A]n expert's opinion which is rendered to a reasonable degree of professional certainty is, itself, substantive evidence." **Aumick**, 297 A.3d at 782 (citation omitted).

Subchapter H of SORNA defines an SVP as someone who has been convicted of one of the enumerated offenses, and "who is determined to be a[n SVP] under section 9799.24 (relating to assessments) due to a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses." 42 Pa.C.S.A. § 9799.12. An act is considered "predatory" under SORNA if it is "directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization." **Id**.

Grant claims the Commonwealth failed to sustain its burden of proving he was an SVP. Grant contends Dr. Muscari's opinion he met the statutory definition of an SVP "misinterpreted the record"[3] and "manipulated" the statutory definitions of "promote" beyond its plain meaning. Grant's Brief at 17-19. He argues he did not "promote" a relationship with S.F. to facilitate or support victimization because "nothing in the record establish[ed he either] sought out the company of S.F. (as it was her grandmother who sought out the relationship)" or "encouraged, by simply being her step-grandfather, S.F. to engage in sexual conduct." *Id*. at 18-19.

The trial court explained it designated Grant as an SVP for the following reasons:

> In the current case, the jury found [Grant] guilty of all charges comprised of seven felonies and a misdemeanor offense for multiple sexual actions he took toward his step-granddaughter over a period of 6 years, beginning when she was 5 years old. . ..
>
> Dr. Muscari testified that determining SVP status is statutory in nature and is an assessment as to whether a defendant meets two main criteria: "the mental abnormality/personality disorder, which is the impetus for their sexual offending, and also do they meet the predatory criteria." She explained that this is not an individualized risk assessment with factors standing on their own. Dr. Muscari stated that she assessed [Grant] to be a pedophile likely to offend again; she further provided a copy of her report. This condition was uncontroverted as . . . [Ms.] Feneck . . . also determined that [Grant] had a pedophilic disorder.
>
> In her evaluation, Dr. Muscari considered that [Grant's] relationship to the victim was that of step-grandfather and step-

---

[3] Grant, for example, complains Dr. Muscari improperly suggested that his touching of S.F.'s vagina over her clothes could be considered a form of penetration. Grant's Brief at 20.

granddaughter, and [Grant] perpetrated multiple acts over a period of time when he was between the ages of 47 and 52. Dr. Muscari also considered the age of [S.F.] being pre-pubescent between the ages of 5 to 10, which is indicative of pedophilic behavior that cannot be cured, but only managed, noting: "Since she's a minor, she doesn't have the legal ability to consent. She was also a very young minor when this happened; so, therefore, that makes her more vulnerable to victimization." Dr. Muscari stated specifically that [Grant] did in fact "promote the relationship for victimization" because he altered their relationship with "behaviors of showing pornography" and "walking in front of her naked" which were grooming tactics, as well as exhibited an assaultive nature. She testified:

> As soon as somebody within a family begins to sexually assault another family member, that alters the relationship. And then he groomed the victim, he showed her pornography; so that's promoting the relationship at a victimization level for the purpose of facilitating victimization.

* * * *

. . . [W]ith regard to assessing whether [Grant's] actions were predatory in nature, Dr. Muscari testified that statistically there are two main categories that increase someone's risk to reoffend, either participating in behavior that involves sexual deviance or by being anti-social. Specifically, Dr. Muscari testified: "Those become the two pathways for people to reoffend. . . . Grant is following a sexually deviant pattern, which is considered a lifetime pattern; and, therefore, gives him the likelihood to reoffend." Her testimony and analysis further indicated:

> Q. Okay. And what about the issue of predatory behavior? Did you look at whether or not he met the statutory definition?
>
> A. I did.
>
> Q. And what were your results?
>
> A. I do believe he meets the criteria for predatory criterion. He was the victim's step-grandfather, and he abused that relationship and altered it when he started to assault her, and, therefore, did so by promoting this relationship for the

> purpose of sexual victimization; therefore, he does meet the criteria for the predatory criterion.

Trial Ct. Op., 5/2/24, at 20-22 (record citations omitted). Dr. Muscari stated these opinions to a reasonable degree of professional certainty. *See* N.T., 8/24/22, at 15.[4]

Following our review, we conclude Grant's issue is meritless. This Court's sufficiency standard of review does not allow this Court to reweigh the evidence considered by the trial court. *See Meals*, 912 A.2d at 223-24 (noting that a claim that an expert's diagnosis was not fully explained, did not square with accepted analyses of the disorder, or was simply erroneous go to the weight, and not the sufficiency, of the expert evidence). Moreover, Grant's suggestion that his abuse of S.F. was merely the opportunistic exploitation of a family member overlooks the fact the definition of predatory does not require the relationship between the defendant and the victim exist solely to support or facilitate victimization. *See* 42 Pa.C.S.A. § 9799.12 (defining "predatory" as "an act directed . . . at a person with whom a relationship has

---

[4] The trial court noted that in a recent non-precedential decision, citable pursuant to Pa.R.A.P. 126(b), this Court concluded there was sufficient evidence to support an SVP determination where a SOAB assessor testified, *inter alia*, the defendant displayed predatory behavior when "he intentionally engaged in a relationship with a child for the purpose of sexual victimization." Trial Ct. Op., 5/2/24, at 23 (discussing **Commonwealth v. Morehart**, 309 A.3d 1035, 2023 WL 7409256, at *3 (Pa. Super. filed Nov. 8, 2023) (non-precedential decision) (noting the defendant "cultivat[ed] a physically intimate relationship with his daughter that began with drying her off after a shower and then having her in his bed with him and engaging in escalating sexual behavior with her"); *see also* Pa.R.A.P. 126(b) (stating unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

been . . . promoted, in whole **or in part**, in order to facilitate or support victimization") (emphasis added); **Commonwealth v. Eberly**, 237 A.3d 483, 2020 WL 2764231, at *4 (Pa. Super. filed May 27, 2020) (non-precedential decision) (noting that "[t]he existence of a familial relationship with the victim . . . does not preclude a finding that an offender's behavior was predatory in nature").

Here, as set forth by the trial court, the evidence presented at the SVP hearing established Grant (1) suffered from a mental abnormality/personality disorder, pedophilia, that made him likely to commit predatory sexually violent offenses and (2) demonstrated predatory behavior by his course of conduct in abusing S.F. over a period of years in a "grooming" pattern that altered the existing familial relationship with S.F. and promoted a different relationship that facilitated or supported victimization. **See** N.T., 8/24/22, at 15, 31-33. Based on this record, we conclude there was sufficient evidence supporting the trial court's designation of Grant as an SVP. **See Meals**, 912 A.2d at 218; **Aumick**, 297 A.3d at 776.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/2/2025