Commonwealth v. Woomer

*Karen L. Mansfield, assistant district attorney,* for Commonwealth.

*Christopher M. Patterson,* for defendant.

ASHWORTH, *J.,* March 10, 2009—Presently before this court are defendant Joy M. O'Shea-Woomer's petitions for writ of habeas corpus and for bail. For the reasons set forth below, this court must deny both petitions.

## I. PROCEDURAL BACKGROUND

On October 8, 2008, defendant was charged with one count of criminal homicide, 18 Pa.C.S. §2501,[1] one count of drug delivery resulting in death, 18 Pa.C.S. §2506, and one count of delivery of controlled substance, 35 P.S. §780-113(a)(30). The criminal complaint alleges that on September 27, 2002, defendant "did intentionally, knowingly, recklessly or negligently cause the death of another human being . . . [when defendant] did administer the drug morphine to victim Brent Weaver which resulted in his death while under her care. There was no prescription by a doctor for Brent Weaver to be given

---

1. The Commonwealth charged defendant with homicide generally pursuant to 18 Pa.C.S. §2501, rather than charging her with a particular degree of murder pursuant to 18 Pa.C.S. §2502.

morphine and [defendant] was not authorized or permitted to administer the drug to the victim."[2] (emphasis in original)

Defendant was arrested and preliminarily arraigned on October 8, 2008. After her arraignment, defendant was remanded to the Lancaster County Prison without bail. The magisterial district judge did not set bail on the basis that the charge against O'Shea-Woomer was a non-bailable offense. A preliminary hearing was held before Magisterial District Judge David E. Brian on December 1, 2008. At the conclusion of the hearing, Judge Brian found that the Commonwealth had established a prima facie case as to all offenses and ordered defendant held for court.

On December 15, 2008, defendant presented, in chambers, a petition to schedule a bail hearing. Pennsylvania Rule of Criminal Procedure 520(A) requires that bail before verdict shall be set in all cases as permitted by law. The comment to this rule references Article I, Section 14 of the Pennsylvania Constitution, as amended November 8, 1998, which provides that an accused is entitled to bail "except for capital offenses or for offenses for which the maximum sentence is life imprisonment . . . when the proof is evident or presumption great. . . ."

The court heard oral argument on the bail petition at which time defense counsel claimed the Commonwealth

_____

2. Morphine is a schedule II substance under the Controlled Substance, Drug, Device, and Cosmetic Act of April 14, 1972 (P.L. 233, no. 64). (See notes of testimony (N.T.), preliminary hearing at 74.)

failed to produce any evidence at the preliminary hearing that the alleged homicide was an intentional killing.[3] Defense counsel argued that the evidence presented by the Commonwealth, viewed in the light most favorable to the Commonwealth, established murder in the third degree only. The Commonwealth claimed that the evidence against defendant could give rise to first- or second-degree murder.

Insofar as many of defense counsel's arguments were tantamount to arguments presented in a habeas corpus petition, an order was entered on December 16, 2008, directing defendant to file a petition for writ of habeas corpus on or before December 24, 2008, and scheduling a hearing on both petitions for February 11, 2009. The habeas corpus petition was timely filed by defendant and the Commonwealth filed a response.

When the hearing convened on February 11, 2009, the Commonwealth asked the court to take judicial notice of the information contained in the affidavit of probable cause, as well as the testimony from the preliminary hearing. Additionally, the Commonwealth introduced the autopsy report of Wayne K. Ross M.D., Lancaster County's forensic pathologist, and the expert report of Robert A. Middleberg Ph.D., vice president of quality assurance and laboratory director for National Medical Services. The court deferred its ruling, allowing the parties to file briefs in support of their positions. The briefs

---

3. Upon this court's request, a transcript of the preliminary hearing was provided by the Commonwealth prior to the oral argument on bail.

having been filed, this matter is now ripe for disposition.

## II. DISCUSSION

### A. *Admissibility of the Expert Report of Dr. Middleberg*

Initially, defendant objects to the admission of the hearsay report of forensic toxicologist, Dr. Middleberg, for purposes of establishing a prima facie case. When considering the use of hearsay evidence during a preliminary hearing, I must keep in mind the purpose of a preliminary hearing:

"The preliminary hearing is not a trial. The principal function of a preliminary hearing is to protect an individual's right against an unlawful arrest and detention. At this hearing, the Commonwealth bears the burden of establishing at least a prima facie case that a crime has been committed and that the accused is probably the one who committed it. It is not necessary for the Commonwealth to establish at this stage the accused's guilt beyond a reasonable doubt. In order to meet its burden at the preliminary hearing, the Commonwealth is required to present evidence with regard to each of the material elements of the charge and to establish sufficient probable cause to warrant the belief that the accused committed the offense." *Commonwealth v. McBride,* 528 Pa. 153, 157-58, 595 A.2d 589, 591 (1991). (citations omitted)

"Since the Commonwealth merely bears the burden of establishing a prima facie case against the defendant,

credibility is not an issue at a preliminary hearing." *Commonwealth v. Fox,* 422 Pa. Super. 224, 234, 619 A.2d 327, 332 (1993). See also, *Liciaga v. Court of Common Pleas of Lehigh County,* 523 Pa. 258, 264, 566 A.2d 246, 248 (1989) (magistrate is precluded from considering the credibility of a witness who is called upon to testify during the preliminary hearing); *Commonwealth v. Tyler,* 402 Pa. Super. 429, 434, 587 A.2d 326, 328 (1991) (credibility is not an issue at a preliminary hearing). A preliminary hearing is a much less searching exploration into the merits of the case. *Fox, supra* at 234, 619 A.2d at 332 (citing *Barber v. Page,* 390 U.S. 719, 725 (1968)). See also, *Commonwealth v. Jackson,* 849 A.2d 1254, 1257 (Pa. Super. 2004). When considering the limited function of a preliminary hearing and the fact that the magisterial district judge is precluded from making credibility determinations, it makes little sense to require the personal appearance of witnesses such as pathologists, chemists, doctors, firearms experts, etc., to reiterate orally their written findings.

Accordingly, our appellate courts have long recognized and approved the use of hearsay evidence to establish a prima facie case at a preliminary hearing, especially where there is testimony that the source of the hearsay will be available to testify at trial. See *Commonwealth v. Troop,* 391 Pa. Super. 613, 622, 571 A.2d 1084, 1088-89 (1990); *Commonwealth v. Davis,* 308 Pa. Super. 204, 214, 454 A.2d 92, 97 (1982); *Commonwealth v. Branch,* 292 Pa. Super. 425, 428-29, 437 A.2d 748, 750 (1981); *Commonwealth v. Rick,* 244 Pa. Super. 33, 37, 366 A.2d 302, 304 (1976). In *Troop,* the court noted that "the difference in purpose between a preliminary hearing and a

trial dictates a different enforcement of the rules of evidence." *Supra* at 621, 571 A.2d at 1088-89.

Although the case law establishes that hearsay evidence may be admitted in a preliminary hearing, the law is equally clear that hearsay evidence *alone* may not be the basis for establishing a prima facie case in a preliminary hearing. See *Jackson, supra* at 1257; *Tyler, supra* at 433-34, 587 A.2d at 328 (citing *Commonwealth ex rel. Buchanan v. Verbonitz,* 525 Pa. 413, 417, 581 A.2d 172, 173 (1990) (plurality opinion) (hearsay testimony, *standing alone,* may not constitute sufficient evidence to establish a prima facie case at a preliminary hearing)).

In the instant case, Dr. Middleberg's hearsay report, proffered to establish the timing of the morphine administration to the victim, is not the sole evidence before this court, as was the case in *Buchanan.* There is the additional preliminary hearing testimony of Dr. Ross, Officer Jennifer Kulicki, Carol Weaver, Mark Weaver, Detective Joseph Geesey and Detective Paul Fitzsimmons, as well as the affidavit of probable cause and autopsy report which were introduced at the habeas corpus proceeding. Thus, this is not a case where the hearsay evidence *alone* is being offered to establish a prima facie case. Rather, the Commonwealth is seeking to enter the report as part of the totality of evidence submitted in order to establish a prima facie case to support the charges of criminal homicide, drug delivery resulting in death, and delivery of a controlled substance.

Next, defendant contends that the introduction of Dr. Middleberg's expert report violates her right to confron-

tation. Defendant cites the plurality decision[4] in *Buchanan, supra* at 419, 581 A.2d at 175, for the proposition that "the rights to confrontation and cross-examination are applicable at a preliminary hearing."[5] (See defendant's brief at 2.) However, the United States Supreme Court in *Pennsylvania v. Ritchie,* 480 U.S. 39, 52 (1987), observed that the right to confrontation is a *trial right.* Our Superior Court has consistently relied upon *Ritchie* in finding that an accused's right to confrontation is not violated by the admission of hearsay at the preliminary hearing stage of a criminal proceeding. See for example, *Commonwealth v. Herrick,* 442 Pa. Super. 412, 429, 660 A.2d 51, 60 (1995); *Tyler, supra* at 434, 587 A.2d at 328; *Commonwealth v. Byuss,* 372 Pa. Super. 395, 397, 539 A.2d 852, 854 (1988).

As noted by defendant, however, the Pennsylvania Supreme Court has not yet answered the question as to what extent the admission of hearsay violates a defendant's right to confrontation *at a preliminary hearing.* Defendant cites to *Crawford v. Washington,* 541 U.S. 36

---

4. As a plurality decision, *Buchanan* lacks precedential value. See *In the Interest of O.A.,* 552 Pa. 666, 676 n.4, 717 A.2d 490, 496 n.4 (1998) (legal conclusions or reasoning employed in plurality opinion are not binding authority). See also, *Ramsay v. Pierre,* 822 A.2d 85, 91 (Pa. Super. 2003); *Commonwealth v. Hanawalt,* 419 Pa. Super. 411, 419, 615 A.2d 432, 437 (1992).

5. As stated by Justice Cerillo in *Fox, supra* at 233-34, 619 A.2d at 332: "[W]hile the *Buchanan* plurality suggests a right to confront and cross-examine at a preliminary hearing, citing the United States and Pennsylvania constitutions in support thereof, the precise holding in *Buchanan* is that hearsay testimony *alone* (emphasis added) is insufficient to establish a prima facie case at a preliminary hearing. Hence, Fox's reliance on *Buchanan* is misplaced." See also, *Commonwealth v. Nieves,* 876 A.2d 423, 425 n.2 (Pa. Super. 2005).

(2004), to support her argument that failure of Dr. Middleberg to testify at the habeas corpus hearing violates defendant's right to confrontation. In *Crawford*, the United States Supreme Court held that the confrontation clause of the Sixth Amendment of the United States Constitution[6] prohibits the use *at trial* of testimonial hearsay obtained by law enforcement officers against a criminal defendant, even if such hearsay is reliable, unless the defendant has the opportunity to cross-examine the out-of-court declarant.[7] *Id.* at 53-54. The Pennsylvania cases that have analyzed the *Crawford* decision have consistently held that the Sixth Amendment right to confrontation is a trial right distinct from pretrial proceedings. See for example, *Commonwealth v. King,* 959 A.2d 405, 415-16 (Pa. Super. 2008) ("Under *Crawford,* no prior testimonial statement made by a declarant who does not testify *at the trial* may be admitted against a defendant unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." (emphasis added)); *In re S.R.,* 920 A.2d 1262, 1265 (Pa. Super. 2007) (same). Defendant has yet to go

---

6. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Constitution Amendment VI.

7. In so doing, the court announced a new interpretation of the confrontation clause, overruling, in part, its earlier holding in *Ohio v. Roberts,* 448 U.S. 56 (1980), which held the admission of hearsay testimony made by an unavailable witness against a criminal defendant is admissible under the confrontation clause if the statement is surrounded by "adequate indicia of reliability," that is, when it either fits within a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." *Crawford, supra* at 40 (quoting *Roberts, supra* at 66.)

to trial; as such, her Sixth Amendment right to confront adverse witnesses has not been triggered. Defendant may raise this issue again at the time of trial if the Commonwealth attempts to admit this hearsay report without calling Dr. Middleberg to testify.

Defendant next argues that use of hearsay evidence is prohibited when used to establish an element of a criminal prosecution. Specifically, defendant claims the Commonwealth has attempted to introduce Dr. Middleberg's expert report to establish an intentional killing.[8] (See defendant's brief at 2.) It is well-settled that "[i]f [the evidence is] offered to prove an essential element of the crime or connect the defendant directly to the commission of the crime, then [the evidence] must be proved through persons having personal knowledge of the element or connection and such persons must be available to testify for cross-examination" or the confrontation clause is violated. *Commonwealth v. McCloud,* 457 Pa. 310, 314-15, 322 A.2d 653, 656 (1974) (quoting *State v. Matousek,* 287 Minn. 344, 350, 178 N.W.2d 604, 608 (1970)).[9] This principle, however, is applicable at the

---

8. The Commonwealth contends that Dr. Middleberg's expert report is *not* being used to establish the intent element for first-degree murder. Rather, the hearsay evidence is allegedly being proffered, in conjunction with other testimony, to establish sole and exclusive custody by defendant at the time the morphine would have been administered, causing Brent Weaver's death. (See Commonwealth brief at 2.)

9. In *McCloud,* the defendant was on trial for murder. The medical examiner who performed the autopsy on the victim was unavailable to testify because he was out of town at a medical conference. The trial court allowed the admission of the medical examiner's report and its conclusion to establish the victim's cause of death under the Uniform Business Records as Evidence Act exception to the hearsay rule. The Supreme Court found that the trial court erred in admitting the medical

trial stage, not at the preliminary hearing stage of the criminal proceedings.[10]

Pursuant to *McCloud,* Dr. Middleberg's hearsay report alone could not be used to establish an element of this criminal prosecution were this case to proceed to trial, absent a compelling necessity for his unavailability. However, at this stage in the proceedings, there is no violation of defendant's right to confrontation.

Based upon the foregoing, I find that the expert report of Dr. Middleberg is admissible for purposes of establishing a prima facie case.

## B. *Petition for Writ of Habeas Corpus*

In her habeas corpus petition, defendant seeks relief on two grounds. First, she claims that the evidence was insufficient to establish a prima facie case of murder of the first, second or third degree. Second, she claims that the Commonwealth failed to prove a prima facie case of drug delivery resulting in death or delivery of a controlled substance. (See defendant's petition at ¶¶5, 6.) In her brief, however, defendant has limited her argument to

---

examiner's conclusion as to cause of death because it established an element of the crime, thereby violating the confrontation clause. *Supra* at 315-16, 322 A.2d at 656-57. The court noted that the medical examiner's absence because of his attendance at a medical conference did not constitute "compelling necessity to override the constitutional mandate." *Id.* at 315 n.5, 322 A.2d at 656 n.5.

10. For this reason, the Florida case cited by defendant, *Johnson v. State,* 929 So.2d 4 (Fla. 2005), is inapposite because it dealt with the admission of a lab report *at trial.* (See defendant's brief at 3.)

the sole issue of whether the Commonwealth has met its burden of establishing a prima facie case of first-degree homicide based upon all evidence submitted in the instant case. (See defendant's brief at 3.) I will, nonetheless, address all issues raised in defendant's petition for writ of habeas corpus.

It is well-settled that the method for testing a pretrial finding of a prima facie case is by writ of habeas corpus. *Commonwealth v. Carroll,* 936 A.2d 1148, 1152 (Pa. Super. 2007).

"To demonstrate that a prima facie case exists, the Commonwealth must produce evidence of every material element of the charged offense(s) as well as the defendant's complicity therein. In an effort to meet its burden, the Commonwealth may utilize the evidence presented at the preliminary hearing and also may submit additional proof. Proof beyond a reasonable doubt is not required at the habeas stage, but the Commonwealth's evidence must be such that, if accepted as true, it would justify a trial court in submitting the case to a jury. Additionally, in the course of deciding a habeas petition, a court must view the evidence and its reasonable inferences in the light most favorable to the Commonwealth. Suspicion and conjecture, however, are unacceptable." *Id.* (citations omitted)

Thus, my purpose is not to determine the accused's guilt but to evaluate if sufficient probable cause exists to require the accused to stand trial.

Viewed most favorably to the Commonwealth, the evidence from the preliminary hearing and the habeas corpus hearing (including the affidavit of probable cause,

the autopsy report and the Middleberg report) reveals the following facts. Brent Weaver suffered from cerebral palsy, a seizure disorder and spastic paraplegia. (Notes of testimony (N.T.), preliminary hearing at 25, 33.) He was unable to walk or talk, although he could verbalize sounds. (*Id.* at 25, 33, 34-35.) He had recently had surgery at duPont Hospital in Delaware to correct a curvature of his spine and he was showing signs of improvement with regard to his seizures. *(Id.)*

Brent required full-time care. (N.T., preliminary hearing at 25.) His mother, Carol Weaver, provided for Brent from after school until 12 a.m., at which time a nurse from Bayada Nurses Home Care Specialists would come to the home and stay until 8 a.m. (*Id.* at 26.) The Weavers had been using these nursing services since 2001. (Affidavit of probable cause at ¶8.)

Brent was fed through a "G-tube" or "feeding tube." (N.T., preliminary hearing at 26.) His mother was the sole person responsible for his feedings. *(Id.)* These feedings generally occurred around the clock, with the feeding pump administering two to three ounces of food an hour. (*Id.* at 28.)

On September 26, 2002, Mrs. Weaver administered her son's evening medications—which did not include morphine—at approximately 8:30 p.m. (N.T., preliminary hearing at 39; affidavit of probable cause at ¶13.) His twice daily medications were inserted directly into Brent's feeding tube. (N.T., preliminary hearing at 40.) The feeding pump would be turned off and the food stopped while the medications were administered. *(Id.)* Turning the feeding pump off would deactivate the alarm

and when the pump was turned on again, it would make a beep. (*Id.* at 40-41.)

Brent was put to bed by his mother at 9 p.m., at which time she hooked up the feeding tube. (N.T., preliminary hearing at 27, 36.) He was tired but otherwise "fine"—"laughing, happy and acting normal[ly]." (*Id.* at 28; affidavit of probable cause at ¶13.) He fell asleep that night without a problem. *(Id.)* Brent's usual night nurse, Melissa Rice, was unavailable that evening and a substitute was sent in her place, Joy O'Shea-Woomer, a licensed practical nurse and the defendant in this case. (N.T., preliminary hearing at 28, 35.) Mrs. Weaver had met defendant approximately six months prior when defendant "shadowed" Brent's regular nurse, Ms. Rice. (*Id.* at 35-36; see also, 53.)

Mrs. Weaver testified that the defendant arrived "between 10:30 and 11 p.m.,"[11] (N.T., preliminary hearing at 29; affidavit of probable cause at ¶13.) Both she and her husband, and their other two children, then ages 7 and 9, were all asleep on the second floor of the house at that time. (*Id.* at 27, 29-30.) Mrs. Weaver heard defendant enter the house so she went downstairs to meet her and noted she was carrying a "couple bags." (*Id.* at 29, 39.) Mrs. Weaver explained to defendant that her son had had surgery three months prior and that he might be uncomfortable during the night. (*Id.* at 30.) However, Mrs. Weaver cautioned defendant that if she felt he

---

11. The regular night nurse worked from midnight to 8 a.m. (N.T., preliminary hearing at 26, 36.) Defendant had requested to come earlier and leave earlier because of child care issues in the morning. (*Id.* at 36.)

needed any medication, even Tylenol, she was to call Mrs. Weaver first as Mrs. Weaver was the only person who administered medications to her son.[12] (*Id.* at 30, 41.)

Brent's bedroom was on the first floor and Mrs. Weaver showed defendant where he was and discussed with her his feeding pump but defendant "seemed to not be that interested." (N.T., preliminary hearing at 30.) Defendant was supposed to sit in the family room during her shift, which allowed a view into Brent's bedroom. There was also a baby monitor in the family room so the nurse could hear any noises in Brent's bedroom. (*Id.* at 30, 37, 43.) After giving her instructions to defendant, Mrs. Weaver returned to bed and did not come back downstairs the rest of the night. (*Id.* at 30-31.)

At 6 a.m., the Weaver's alarm went off and Mrs. Weaver stated that she remained in bed for two or three minutes. (N.T., preliminary hearing at 31.) She heard "shuffling" in Brent's room through a baby monitor that she kept by her bed and then heard defendant come up the stairs and say repeatedly that Brent was "not responding." (*Id.*) Mrs. Weaver ran downstairs and found her son "gray and lifeless" on the bed. (*Id.*) She placed Brent on the floor and asked defendant why she wasn't doing CPR. (*Id.* at 31-32.) Defendant responded to the question by starting CPR. (*Id.* at 32.) Defendant did not have any answers to Mrs. Weaver's questions about what had hap-

---

12. Brent was not prescribed any pain medication upon his release from the hospital following his back surgery. Mrs. Weaver was giving him only Motrin for pain. (N.T., preliminary hearing at 34.)

pened during the night. (*Id.* at 45; affidavit of probable cause at ¶13.) Mr. Weaver, who had followed his wife down the stairs, immediately called 911. (N.T., preliminary hearing at 32.)

Officer Jennifer M. Kulicki, with the East Hempfield Police Department, was the first to respond to the scene. (N.T., preliminary hearing at 20-21.) Officer Kulicki attached an automatic defibrillator, or AED, to the victim but it indicated that it did not pick up anything to shock. (*Id.* at 23.) The officer then assisted defendant with CPR. *(Id.)* When the ambulance personnel arrived, they inserted a breathing tube into Brent. *(Id.)* Officer Kulicki did not observe the EMTs administer any other treatment. *(Id.)* Brent was ultimately transported to Lancaster General Hospital. (*Id.* at 11, 32, 55, 63, 73-74.)

Mrs. Weaver testified that she did not administer morphine to her son the night of September 26, 2002, her son was not prescribed morphine, and there was no morphine or codeine in the house. (N.T., preliminary hearing at 31, 32, 41.) Nor were there any syringes or needles in the house. (*Id.* at 41.) Mrs. Weaver explained that Brent was allergic to morphine and codeine.[13] (*Id.* at 46.)

---

13. Brent had just recently had an allergic reaction to morphine when it was given to him at duPont Hospital following his back surgery. (N.T., preliminary hearing, at 48.) Two years earlier, Brent had been prescribed Tylenol with codeine following a broken leg and it caused his respiration to drop to such a point that an ambulance had to be called to "revive" him and he was hospitalized overnight. (*Id.* at 46, 49.)

Mrs. Weaver further testified that she did not hear the alarm on the feeding pump during the night indicating an interruption and she did not hear a beep on the feeding pump indicating that it had been stopped and started again. (N.T., preliminary hearing at 37, 41.) Lastly, on cross-examination, Mrs. Weaver testified that the feeding bag with formula that Brent was taking the night he was killed were disposed of "right away." (*Id.* at 44.) The G-tube was discarded "probably weeks after he died."[14] *(Id.)*

Mr. Mark Weaver, Brent's dad, also testified at the preliminary hearing. (N.T., preliminary hearing at 50.) He stated that he went to bed at 10 p.m., and remained in bed asleep all night until he heard defendant shouting, "he's not responding, he's not responding." (*Id.* at 51, 53.) He ran downstairs and called 911. *(Id.)* Mr. Weaver denied giving his son morphine the night of September 26, 2002, denied having a morphine prescription for his son, and further denied having morphine in the house. (*Id.* at 52.) Both Mr. and Mrs. Weaver testified that their son was not suffering from a cold in the hours or days before his death. (*Id.* at 41, 52.)

Following the death of 11-year-old Brent Weaver, Dr. Ross, Lancaster County's forensic pathologist, conducted an external examination of, and withdrew blood from, Brent Weaver. (N.T., preliminary hearing at 6, 10-11.) The blood was transported to and tested by Na-

---

14. The internal stomach tube or "PEG feeding tube" was removed from the victim by Dr. Ross during the autopsy and sent to National Medical Services in Willow Grove, Pennsylvania, for laboratory analysis. (N.T., preliminary hearing at 10.)

tional Medical Services. (Affidavit of probable cause at ¶5.) On November 4, 2002, the blood was examined by Forensic Toxicologist George F. Jackson Ph.D., at National Medical Services Laboratory. Morphine, in the amount of 230 nanog/mL, was found to be in the blood of Brent Weaver. This information was forwarded to Dr. Ross. *(Id.)*

On November 5, 2002, Dr. Ross advised the police of the abnormal amount of morphine in the victim's blood and requested the East Hempfield Police to conduct a further investigation as to who may have administered the morphine and why. (Affidavit of probable cause at ¶7.) Consequently, Detective Paul Fitzsimmons interviewed the victim's parents on November 8, 2002. *(Id.* at ¶¶12, 13.) Detective Fitzsimmons also surveyed the layout of the Weaver home with Mr. and Mrs. Weaver. *(Id.* at ¶14.)

On November 8, 2002, Detective Fitzsimmons, along with Detective Tammy Marsh, interviewed defendant. (Affidavit of probable cause at ¶15; see also, N.T., preliminary hearing at 79.) Defendant indicated that Bayada Nurses called her, on short notice, to fill in at the Weavers' for their regular nurse. (Affidavit of probable cause at ¶15.) She reported that she arrived at the home at about 11 p.m. on September 26, 2002, and met Carol Weaver and received care instructions. Defendant noted that she and Mrs. Weaver went into Brent's bedroom and Brent was moaning. Defendant stated that Carol Weaver showed her how to turn Brent to make him comfortable. Mrs. Weaver then went to bed and neither Carol Weaver nor her husband came downstairs all night. *(Id.)*

Defendant told Detective Fitzsimmons that she stayed on the couch in the living room[15] for about 15 minutes before she had to go to Brent's room because he was moaning. (Affidavit of probable cause at ¶16.) She said she had to reposition him three to four times throughout the night. Defendant indicated that she went into Brent's room at 6 a.m. to administer his medications and turned on the light and saw that Brent was blue. She stated that she tried to arouse him, checked for a pulse and found none. She then said she went upstairs to call Mrs. Weaver and tell her Brent was not responsive and not breathing. (*Id.*) Defendant said she started CPR, and continued with the police until the paramedics arrived. (*Id.;* N.T., preliminary hearing at 21, 23.) She denied falling asleep during the night. (*Id.;* N.T., preliminary hearing at 73.)

As a result of the initial investigation, Brent Weaver's body was exhumed on November 12, 2002, and a complete autopsy was performed by Dr. Ross. (N.T., preliminary hearing at 11.) Tissue samples were taken and sent to National Medical Services for analysis. (*Id.* at 13.)

Following the exhumation and autopsy of Brent Weaver's body, and while awaiting the results from National Medical Services, the East Hempfield Police continued their investigation into the death of Brent Weaver. On November 13, 2002, Detective Fitzsimmons

---

15. Affidavit of probable cause identifies the area beside the kitchen where the night nurse stayed as the "living room," while Mrs. Weaver's testimony at the preliminary hearing was that the room is referred to as their "family room." (See N.T., preliminary hearing at 30, 42.)

spoke to Dr. Stephen Tifft and Dr. Michael Haught, from Roseville Pediatrics, and learned that they were in charge of Brent Weaver's medical treatment plan, including the prescription of medications. (Affidavit of probable cause at ¶9.) Both Dr. Tifft and Dr. Haught indicated that they had not prescribed morphine for Brent. On November 13, 2002, Detective Fitzsimmons reviewed the Roseville Pediatrics medical records of Brent Weaver which confirmed that Brent Weaver was not prescribed any narcotics, including morphine, at the time of this death. *(Id.)*

A further review of the medical records on November 13, 2002, from Lancaster General Hospital and Susquehanna Valley Ambulance revealed that no morphine was administered to Brent at the hospital or by the ambulance crew as part of his care on September 27, 2002. (Affidavit of probable cause at ¶¶8, 11; N.T., preliminary hearing at 73-74.)

Also on November 13, 2002, Detective Fitzsimmons reviewed the medical records of Bayada Nurses Home Care Specialists. (Affidavit of probable cause at ¶¶8, 17.) The "specialist nurse's note" report prepared and signed by defendant on September 26, 2002 and September 27, 2002, indicated that at 12:30 a.m., 1:15 a.m., 1:30 a.m., and 2:45 a.m., Brent was restless or moaning and defendant entered his bedroom and repositioned him in his bed. *(Id.* at ¶17.) The report then indicates that defendant looked in on Brent between 2:45 a.m. and 6 a.m. and that he was sleeping soundly but that defendant did not physically enter the bedroom of Brent Weaver until 6 a.m., which is the time he was to receive his medication. *(Id.)*

An interview with Laura Rauth, supervising nurse at Bayada Nurses, took place on November 13, 2002. (Affidavit of probable cause at ¶19.) Ms. Rauth indicated that defendant cared for two terminally ill Hospice patients and that she had administered morphine to these patients, which was prescribed for them. *(Id.)* Ms. Rauth further indicated that one of the patients passed away on August 4, 2002, and that defendant had last worked with that patient on July 29, 2002, and the other patient passed away on September 19, 2002, and that defendant had last cared for that patient on July 15, 2002. *(Id.;* N.T., preliminary hearing at 65-66, 83-84.)

On April 25, 2003, Dr. Edward J. Barbieri Ph.D., forensic toxicologist with National Medical Services, filed a report indicating that 150 nanog/g of morphine was found in the liver of Brent Weaver. (Affidavit of probable cause at ¶18.) Based on the autopsy, the toxicology report, and a review of the medical history of Brent Weaver, Dr. Ross determined the cause of death to be acute morphine intoxication and manner of death to be homicide. *(Id.;* N.T., preliminary hearing at 5.)

Detective Fitzsimmons, along with Detective Joseph Geesey, a detective with the Lancaster County District Attorney's Office, re-interviewed defendant on August 20, 2003.[16] (N.T., preliminary hearing at 57; affidavit of probable cause at ¶20.) Essentially, defendant said she

---

16. The affidavit of probable cause lists the date as June 20, 2003, but Detective Geesey testified at the preliminary hearing that it was actually August 20, 2003. (N.T., preliminary hearing at 57, 65.)

arrived at the Weaver home, somewhat reluctantly,[17] at approximately 11 p.m., received instructions from Mrs. Weaver, and checked on Brent approximately every 45 minutes until 2 a.m., after which she simply went to his bedroom door and looked in. (*Id.* at 57-58, 62-63.) At 6 a.m., defendant said she entered the bedroom because that was "when she was supposed to give him his medication" and she found the child "unresponsive."[18] (*Id.* at 58, 63; affidavit of probable cause at ¶¶16, 17.)

Of note, defendant cautioned the detectives that, while she made notes of her care of Brent, "they [the notes] won't document everything I did that night because I didn't do them [the Bayada specialist nurse's notes] until that morning after he had been taken off in the ambulance. The father was in a hurry to leave the house." (N.T., preliminary hearing at 69.) She again indicated that she did not fall asleep during the night and that

17. Defendant told the detectives: "[S]he didn't particularly want to be there that night. She needed the money, but she was—had a lot of things to do. She wasn't feeling that well and that she didn't really want to be there." (N.T., preliminary hearing at 59.) The affidavit of probable cause prepared by Detective Fitzsimmons notes that during this interview, defendant stated: "[S]he worked at the Weaver's that night but really didn't want to be there. [Defendant] also said that she was 'not into doing it,' but needed the money, she was separated from her husband and times were hard." (Affidavit of probable cause at ¶22.)

18. On two occasions, defendant stated during police interviews that she went into Brent's bedroom at 6 a.m. to administer his morning medications. Mrs. Weaver testified that she explicitly warned defendant that she alone administered medications to her son. (N.T., preliminary hearing at 30, 41.) Mrs. Weaver had prepared her son's morning medications the previous night before going to bed and had placed them in the refrigerator. (*Id.* at 42.)

Brent's parents did not come downstairs during the night, "giving her sole and exclusive custody of Brent for the entire night." (*Id.* at 73; affidavit of probable cause at ¶22.)

In response to the detectives' questioning, defendant indicated that she had extensive knowledge of, and experience with, morphine from prior nursing jobs and that she is aware of the various methods of administration (intramuscular, buccal, sublingual, IV) and the effects of morphine. (N.T., preliminary hearing at 60, 61; affidavit of probable cause at ¶20.) Defendant also acknowledged that she had administered morphine to two Hospice patients within a month or two of Brent Weaver's death. (*Id.* at 60, 64-66.) She further admitted that it was possible for a nurse to pilfer her patient's morphine. (*Id.* at 60.)

This case remained dormant until August 20, 2008, when Detective Geesey and Detective Fitzsimmons went to National Medical Services and met with Robert A. Middleberg Ph.D., who is vice president of quality assurance and also the laboratory director. (N.T., preliminary hearing at 74, 82; affidavit of probable cause at ¶23.)

Dr. Middleberg stated there were several ways morphine could be administered into the body. (Affidavit of probable cause at ¶23.) He stated that the amount of morphine found in Brent Weaver's blood if injected directly into the blood stream would have proved fatal very rapidly. Dr. Middleberg stated further that if that amount had been given orally, it could have taken longer for the body to absorb the drug, but certainly the victim would

have been gradually put into a noticeably sedated and lethargic state.[19] *(Id.)*

Dr. Middleberg reviewed the specialist nurse's note report prepared and signed by defendant on September 27, 2002. (Affidavit of probable cause at ¶23.) He stated that if the drug was given prior to defendant's arrival, Brent Weaver would not have been restless and moaning as her report indicated. Instead, Dr. Middleberg indicated that Brent Weaver would have entered a more lethargic and sedated state, which is consistent with how the report written by defendant describes Brent after 3:30 a.m. Given these facts, it was Dr. Middleberg's opinion the drug was administered to Brent after 11 p.m. on September 26, 2002, and prior to 6 a.m. on September 27, 2002. *(Id.; N.T.,* preliminary hearing at 75-76.)

Lastly, on October 6, 2008, Detective Geesey spoke with Steve Knoub, the CEO of Hospice of Lancaster County. (Affidavit of probable cause at ¶21.) Mr. Knoub confirmed that it was possible in 2002 for a nurse working at the home of a patient who had been prescribed morphine to pilfer that morphine and convert it to his or her own use without the knowledge of the patient, the family, or attending medical personnel. *(Id.)*

---

19. Mrs. Weaver testified that when Brent's leg was broken and he was administered Tylenol with codeine, she called her doctor because Brent's respirations were getting low and she was worried. The doctor advised her that she would know he was "having problems if he [became] lethargic." (N.T., preliminary hearing at 48-49.) Brent did show signs of lethargy, an ambulance was called and he needed to be resuscitated and hospitalized. *(Id.* at 46.)

Based on the aforementioned facts, on October 7, 2008, a criminal complaint was filed charging Joy O'Shea-Woomer with administering a lethal dose of morphine to Brent Weaver between the hours of 11 p.m. on September 26, 2002 and 6 a.m. on September 27, 2002, and causing his death based upon the following facts: (1) a large amount of morphine was administered to Brent and, in the professional opinions of Dr. Ross and Dr. Middleberg, it was a lethal dose; (2) defendant had sole and exclusive custody of Brent from 11 p.m. on September 26, 2002, until 6 a.m. on September 27, 2002; (3) prior to Brent Weaver going to bed, he was acting normally and was not lethargic; (4) defendant has been in the medical profession as a nurse for an extensive time period and she is familiar with morphine, what forms it comes in, how to administer it to patients, and she had the means and access to the drug through recent work experience with Hospice patients; (5) the medical records confirm that morphine was not given to Brent in his treatment on September 27, 2002, by Susquehanna Valley Ambulance or Lancaster General Hospital medical personnel; and (6) Brent's condition prior to 3:30 a.m. is inconsistent with having been administered the amount of morphine found in his blood but his condition after 3:30 a.m. is consistent with having been administered that amount of morphine after 11 p.m. on September 26, 2002. (Affidavit of probable cause at ¶24.) Specifically, defendant has been charged generally with criminal homicide, drug delivery resulting in death, and delivery of a controlled substance. I will examine the record to determine if a prima facie case exists for each of these charges.

## C. *Criminal Homicide*

Defendant is charged with criminal homicide, generally, which includes murder of the first, second and third degree, as well as voluntary and involuntary manslaughter.[20] To sustain a charge of murder in the first degree, the Commonwealth must show that a human being was unlawfully killed, the accused committed the killing, and the accused acted with a specific intent to kill. *Commonwealth v. Diggs,* 597 Pa. 28, 35, 949 A.2d 873, 877 (2008). See 18 Pa.C.S. §§2501, 2502(a). It is a specific intent to kill that distinguishes murder in the first degree from other lesser grades of murder. *Commonwealth v. Fletcher,* 580 Pa. 403, 419, 861 A.2d 898, 907 (2004). Apart from felony murder, or murder of the second degree, any murder committed with malice, but without specific intent, constitutes a third-degree murder. *Commonwealth v. Taylor,* 583 Pa. 170, 186, 876 A.2d 916, 926 (2005).

Defendant contends that the Commonwealth has failed to produce any evidence that the alleged homicide (1) was an intentional killing (first-degree murder), (2) occurred while defendant was engaged in a felony (second-degree murder), or (3) resulted from a conscious disregard of an unjustified and extremely high risk by

---

20. The Crimes Code provides:

"*(a) Offense defined.*—A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.

"*(b) Classification.*—Criminal homicide shall be classified as murder, voluntary manslaughter, or involuntary manslaughter." 18 Pa.C.S. §2501.

defendant that her actions might cause death or serious bodily injury (third-degree murder). (See defendant's habeas corpus petition at ¶5.) There is no suggestion that this killing was related to the commission of a felony so murder in the second degree is not relevant to our discussion, nor is the offense of voluntary manslaughter. See *Commonwealth v. Patton,* 936 A.2d 1170, 1178 (Pa. Super. 2007) ("Voluntary manslaughter is the intentional killing of another without malice but in a sudden heat of passion brought on by legal provocation."). I will address only the three relevant classes of criminal homicide.

## 1. First-Degree Murder

Initially, the Commonwealth must provide sufficient evidence to indicate that a crime has been committed. The report of the autopsy conducted on the victim, Brent Weaver, containing the findings of the forensic pathologist, Wayne Ross, was admitted at the habeas corpus hearing without objection, as was his testimony at the preliminary hearing. (N.T., preliminary hearing at 4-5.) The report of Dr. Ross includes his findings that the death of the victim occurred as a result of acute morphine intoxication and indicates that the manner of death is homicide, *i.e.,* that the administration of the morphine was not self-inflicted. I find this evidence sufficient to establish that a crime was committed, that is, that the victim, Brent Weaver, died as a result of an unlawful killing. Therefore, the next question I am faced with is whether the additional evidence presented at the preliminary hearing and habeas corpus hearing is sufficient to establish the probability that defendant can be connected with

the crime, that is, does the additional evidence provide sufficient probable cause to warrant the belief that defendant was involved in the commission of the killing.

In the instant case, in attempting to establish a prima facie case, the Commonwealth relies upon the invocation of the "sole and exclusive custody" doctrine, which is well established in Pennsylvania law. See *Commonwealth v. Meredith*, 490 Pa. 303, 416 A.2d 481 (1980); *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837 (1973); *Commonwealth v. Hart*, 348 Pa. Super. 117, 122-23, 501 A.2d 675, 678 (1985). This doctrine provides that where, as here, an adult is given sole custody of a child of tender years for a period of time and, during that time, the child sustains injuries which unquestionably are neither self-inflicted nor accidental, the evidence is sufficient to allow the fact-finder to infer that the adult having custody inflicted the injuries. *Paquette, supra* at 255, 301 A.2d at 840. This rule, allowing an inference of guilt, has been applied where a child suffers a fatal injury while an adult has sole custody of the child. See *Commonwealth v. Nissly*, 379 Pa. Super. 86, 549 A.2d 918 (1988).

Thus, to invoke the sole and exclusive custody doctrine, the Commonwealth must show (1) serious injury or death, (2) that the injury was neither accidental nor self-inflicted, (3) that the injury was inflicted within a specific time period, and (4) that the defendant had exclusive custody of the victim during the time of the injury. Here, the record contains prima facie evidence of all four prongs of the sole and exclusive custody doctrine.

Initially, the testimony and autopsy report of Dr. Ross establish that Brent Weaver died from acute morphine intoxication and that his death was neither accidental nor self-inflicted. (N.T., preliminary hearing at 5; Commonwealth exhibit no. 4.) Next, the report of Dr. Middleberg establishes that the administration of the morphine occurred between 11 p.m. and 6 a.m. (*Id.* at 75; Commonwealth exhibit no. 3.) Lastly, the evidence is undisputed that defendant had sole and exclusive custody of the victim during this time frame. (See N.T., preliminary hearing at 30-31, 51, 73; see also, affidavit of probable cause at ¶¶15, 22.) Consequently, the evidence is sufficient to allow the fact-finder to infer that defendant, who had sole and exclusive custody of the victim, inflicted the fatal injury to Brent Weaver.

To establish a prima facie case of murder in the first degree, the Commonwealth must also show that defendant acted with a specific intent to kill. *Commonwealth v. Vandivner,* 599 Pa. 617, 628, 962 A.2d 1170, 1176 (2009) (citing 18 Pa.C.S. §2502(d)). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." *Commonwealth v. Wright,* 599 Pa. 270, 291, 961 A.2d 119, 130 (2008) (quoting 18 Pa.C.S. §2502(d)). The mens rea required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence. *Commonwealth v. Jackson,* 955 A.2d 441, 444 (Pa. Super. 2008). "[T]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts[.]" *Id.* (quoting *Commonwealth v. Gease,* 548 Pa. 165, 171, 696 A.2d 130, 133 (1997)).

In the instant case, there was uncontroverted evidence that the victim had not been prescribed morphine, that there was no morphine in the house, and that no morphine had been administered to him in his treatment on September 27, 2002, by Susquehanna Valley Ambulance or Lancaster General Hospital medical personnel. Thus, the lethal dose of morphine, which was carried into the Weaver home, was intentionally and deliberately administered to the victim.

Moreover, specific intent to kill may be inferred from the fact that an accused used a deadly weapon on a vital part of the victim's body. *Vandivner,* 599 Pa. at 627, 962 A.2d at 1176; *Wright,* 599 Pa. at 291, 961 A.2d at 130. The Crimes Code defines a "deadly weapon" as, inter alia, "any . . . instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." *Commonwealth v. Pagan,* 597 Pa. 69, 83, 950 A.2d 270, 279 (2008) (quoting 18 Pa.C.S. §2301); *Commonwealth v. Packard,* 767 A.2d 1068, 1071 (Pa. Super. 2001).

Our appellate courts have never established an exact definition of a deadly weapon, because virtually anything may become deadly when offensively employed. "A weapon not ordinarily termed 'deadly' may become such when used in a killing. An ax, a baseball bat, an iron bar, a heavy cuspidor, and even a bedroom slipper have been held to constitute deadly weapons under varying circumstances." *Commonwealth v. Prenni,* 357 Pa. 572, 575, 55 A.2d 532, 533 (1947). (citation omitted) Our Superior Court cautioned in *Commonwealth v. Stancil,* 233 Pa. Super. 15, 19, 334 A.2d 675, 677 (1975), that it is "virtu-

ally impossible to make a prophylactic rule to cover this problem" of what constitutes a dangerous weapon. "Some weapons are such as a matter of law, and others must be construed by a jury as a matter of fact, in accordance with the evidence and intent of the actor." *Commonwealth v. Taylor,* 346 Pa. Super. 599, 620, 500 A.2d 110, 120-21 (1985).

Dr. Ross testified at the preliminary hearing in this matter that Brent Weaver died from acute morphine intoxication. He also concluded that the manner of death was homicide. Thus, I must review the facts and circumstances of the instant case to determine whether morphine, as allegedly used by defendant, is a deadly weapon.

For morphine to be classified as a deadly weapon, it must be an "instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S. §2301. I am compelled to conclude that morphine can be such an instrumentality. In November 2007, in *State of Texas v. Barbour,* cause no. 21634 (Lamar Cty. TX), a jury found morphine to be a "deadly weapon" when administered by mouth to a child, resulting in the defendant's conviction and a 20-year sentence for physical abuse of a child.

Our Superior Court recently concluded that commercial mouse poison, as used by the defendant, was a "deadly weapon" for purposes of the deadly weapons enhancement provision of the sentencing guidelines. See 204 Pa. Code §303.10(a)(1)(iii). The court explained:

"Mouse poison is clearly an instrumentality, the broad definition of which is a 'thing used to achieve an end or purpose.' Black's Law Dictionary, 8th ed., 2004. Mouse poison is used to kill rodents. Instantly, it became a deadly weapon when appellee included it in the sandwich that she prepared for her husband to consume, in light of her admitted intent to poison him. See *[Commonwealth v.] Scullin,* [414 Pa. Super. 442,] 607 A.2d [750,] 753 [(1992)] (holding that the tire iron 'became a deadly weapon at the moment [the defendant] threw it in the direction of the ultimate victim.').

"That the amount of poison appellee added to the sandwich was apparently insufficient to actually cause serious bodily injury is irrelevant to our conclusion that mouse poison is a deadly weapon under the circumstances of this case. By design and normal usage, mouse poison kills rodents, and thus by its very nature it is toxic and dangerous." *Commonwealth v. Raybuck,* 915 A.2d 125, 129 (Pa. Super. 2006).[21]

Ultimately, in this case, the determination of whether morphine is, in fact, a deadly weapon from which specific intent to kill may be inferred is a factual issue for the jury. See *Stancil, supra* at 18, 334 A.2d at 677

---

21. The Superior Court also found in this case that unidentified household chemicals were *not* to be considered a "deadly weapon" for purposes of the deadly weapons enhancement rule where the charge of aggravated assault stemmed from the defendant's attempt to manufacture a poisonous gas by pouring household chemicals down the bathtub drain. The court noted that as there was no evidence offered as to the specific identity or nature of the chemicals the defendant used, the lower court did not err in declining to apply the deadly weapons enhancement. *Raybuck, supra* at 129-30.

("whether the blow of a fist or the kick of a shoe was of such force as was likely to produce great bodily injury was a question for the jury"). However, for purposes of the petitions presently before the court, the Commonwealth has established a prima facie case of first-degree murder.[22]

Additionally, an intentional killing is also defined as a "killing by means of poison." 18 Pa.C.S. §2502(d). Defense counsel, himself, identified this case as one in which the Commonwealth is "trying to show that my client poisoned this boy with morphine." (N.T., preliminary hearing at 70.) "Morphine sulfate" is identified in medical literature as a *poisonous* agent. Thus, the record evidence of "acute morphine intoxication" or morphine poisoning of this helpless victim could establish the element of specific intent to kill required for first-degree murder.

### 2. Third-Degree Murder

Third-degree murder is any murder other than one committed in the first or second degree. *Commonwealth v. Bullock,* 948 A.2d 818, 823 (Pa. Super. 2008) (citing 18 Pa.C.S. §2502(c)). To prove an accused committed third-degree murder, the Commonwealth need not show

_____

22. In *Commonwealth v. Bradfield,* 352 Pa. Super. 466, 508 A.2d 568 (1986), the defendant was found guilty of first-degree murder where the victim's cause of death was determined to be asphyxiation from an overdose of morphine, which was consistent with having been caused by criminal agency. See also, *Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600 (1989).

he acted with the specific intent to kill another but merely that he acted with malice aforethought or wanton and reckless conduct that manifests extreme indifference to the value of human life. *Id.* at 823-24 (citing *Commonwealth v. Santos,* 583 Pa. 96, 102, 876 A.2d 360, 363 64 (2005)). Malice aforethought, the general intent prerequisite to a finding of murder in any degree, has been defined by the Pennsylvania Supreme Court as follows:

"[M]alice aforethought requires a unique state or frame of mind characterized by wickedness, hardness, cruelty, recklessness, and disregard of social duty:

" 'Malice is a legal term, implying much more [than ill will, spite, or a grudge]. It comprehends not only a particular ill will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Murder, therefore, at common law embraces cases where no intent to kill existed, but where the state or frame of mind termed malice, in its legal sense, prevailed.'

"Malice has been characterized as exhibiting an '*extreme* indifference to human life,' and 'may be found to exist not only in an intentional killing, but also in an unintentional homicide where the perpetrator "consciously disregarded *an unjustified and extremely high risk* that his actions might cause death or serious bodily harm." ' " *Commonwealth v. Ludwig,* 583 Pa. 6, 21-22, 874 A.2d 623, 632 (2005). (citations omitted) (emphasis in original)

I find that the evidence presented in the instant case establishes, at the very least, a prima facie showing of malice. As noted above, the Commonwealth's evidence shows that the lethal dose of morphine, which was carried into the Weaver home, was intentionally and deliberately administered to the victim. Moreover, although a legal drug, morphine is an inherently dangerous drug of such toxicity that there exists a substantial and "extremely high risk" that a child who ingests morphine will suffer serious injury or death. Although there was no testimony at the preliminary and pretrial hearings as to the exact amount of morphine that was administered to the minor victim, Dr. Middleberg's report notes that "[t]ypical peak blood concentrations of free morphine following therapeutic oral doses of the substance are generally less than 100 ng/mL." (See Commonwealth exhibit no. 3 at 4.) The blood of the victim in this case contained 230 ng/mL—a lethal dose. *(Id.)*

Viewing this evidence in the light most favorable to the Commonwealth as I must when considering a petition for habeas corpus, the Commonwealth clearly presented sufficient evidence to support a prima facie finding that defendant, a licensed practical nurse, "exhibit[ed] an extreme indifference to human life" and "consciously disregarded an unjustified and extremely high risk that [her] actions might cause death or serious bodily harm" when she administered morphine, without a prescription, to an "opiate naive" and "opiate sensitive" 11-year-old child resulting in the victim's death. *Ludwig, supra.* (See Commonwealth exhibit no. 3.)

### 3. Involuntary Manslaughter

A person is guilty of involuntary manslaughter when, "as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner . . . he causes the death of another person." *Commonwealth v. Powell,* 598 Pa. 224, 253, 956 A.2d 406, 423 (2008) (citing 18 Pa.C.S. §2504(a)).[23] Like murder of the third degree, involuntary manslaughter is an unintentional killing. See *Commonwealth v. Polimeni,* 474 Pa. 430, 442, 378 A.2d 1189, 1195 (1977).

"What is more important for our present purposes is the fact that under the Crimes Code it is a killing which requires a state of mind which is in effect simply a gradation on the ascending scale of culpability culminating in malice. The state of mind which characterizes involuntary manslaughter is not malicious; it is referred to as 'criminal negligence' and is evidenced by acts, whether lawful or unlawful, done in a 'reckless or grossly negligent' manner as those terms are defined. . . . [T]his court stated that to constitute involuntary manslaughter '[t]he negligence must be such a departure from what would be the conduct of an ordinary prudent or careful man under the circumstances as to evidence a disregard of human life or an indifference to consequences.'" *Id.*

As involuntary manslaughter is a lesser included offense of third-degree murder, see *Commonwealth v. Davis,* 760 A.2d 406, 414 (Pa. Super. 2000) (citing *Polimeni, supra*), I need only cite to our determination above

---

23. See also, 18 Pa.C.S. §§302(b)(3) and 302(b)(4), where the Crimes Code defines reckless and negligent conduct.

that the Commonwealth presented sufficient evidence to support a prima facie case of murder in the third degree to find a prima facie case for involuntary manslaughter as well.

Accordingly, I find that the Commonwealth, through the testimony at the preliminary hearing held on December 1, 2008, and the habeas corpus hearing held on February 11, 2009, has presented sufficient evidence to establish a prima facie case of criminal homicide against defendant.

### D. *Drug Delivery Resulting in Death*

Section 2506 of the Crimes Code defines the crime of third-degree murder in the context where death results from certain conveyances of, inter alia, controlled substances in violation of the Controlled Substance, Drug, Device and Cosmetic Act:

"A person commits murder of the third degree who administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of the Act of April 14, 1972 (P.L. 233, no. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance." 18 Pa.C.S. §2506(a). (footnote omitted)

Our Supreme Court has determined that "malice is the requisite mens rea for a violation of section 2506." *Ludwig, supra* at 20, 874 A.2d at 631.

The Commonwealth's evidence shows that the lethal dose of morphine, which was carried into the Weaver

home, was intentionally and deliberately administered to the victim between the hours of 11 p.m. and 6 a.m. Moreover, the evidence is sufficient to allow the fact-finder to infer that defendant, who had sole and exclusive custody of the victim during this time period, inflicted the fatal injury to Brent Weaver. Having further determined that there was sufficient evidence to establish the element of malice for third-degree murder generally, this court must likewise conclude that the Commonwealth has established a prima facie case of malice for drug delivery resulting in death.

Accordingly, defendant's habeas corpus petition with regard to the charges of delivery of a controlled substance and drug delivery resulting in death must be denied.

## E. *Petition for Bail*

Defendant, who is currently incarcerated in LCP as a result of the pending charges in the present case, requests that this court grant her bail. At issue is the interpretation of Article I, Section 14 of the Pennsylvania Constitution. In pertinent part, this section provides as follows:

"All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great; . . ." Pennsylvania Constitution Article I, Section14. See 42 Pa.C.S. §5701.[24]

---

24. The United States Supreme Court has held that the excessive bail clause of the Eighth Amendment to the United States Constitution

This section was made applicable "for offenses for which the maximum sentence is life imprisonment" by a constitutional amendment approved on November 3, 1998.[25] By its plain language, section 14 requires the detention of any person charged with an offense for which the maximum sentence is life imprisonment when the trial court finds the proof evident or the presumption of guilt great. All other defendants, including those charged with first-degree murder where the proof is not evident and the presumption not great, are bailable on sufficient sureties.

In the instant case, defendant is charged with criminal homicide. It is beyond challenge that defendant will be sentenced to life imprisonment if convicted of first-degree murder. See 18 Pa.C.S. §1102(a)(1). Defendant concedes as much but claims she is entitled to bail because the Commonwealth has failed to prove that the "proof is evident or presumption great" that she will be convicted of first-degree murder.

At a bail hearing, the prosecution has the burden of proving defendant should not be granted bail. *Commonwealth v. Truesdale,* 449 Pa. 325, 337-38, 296 A.2d 829, 836 (1972); *Commonwealth v. Heiser,* 330 Pa. Super. 70, 72, 478 A.2d 1355, 1356 (1984). Presently, it is the Commonwealth that must prove that the "proof is evident or presumption great" that defendant committed first-degree murder before defendant can be detained justifiably

___

does not guarantee a right to bail in all cases. See *U.S. v. Salerno,* 481 U.S. 739, 752-54 (1987). See also, *Commonwealth v. Fowler,* 451 Pa. 505, 509-10, 304 A.2d 124, 126 (1973).

25. The previous language of Section 14 was as follows: "All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident or presumption great; . . . ." Pennsylvania Constitution Article I, Section 14.

pending trial. It is the interpretation of this standard contained in Article I, Section 14 that is at issue here.

Those jurisdictions which have defined the phrase "proof is evident or the presumption is great" have given it various meanings. A survey of case law nationwide by the Supreme Court of the Virgin Islands in *Browne v. People of Virgin Islands,* no. 2008-022, 2008 WL 4132233 (V.I. August 29, 2008), demonstrates that there are three general approaches to defining the evident proof standard: "On the whole, states have defined the standard as requiring either probable cause, something akin to clear and convincing evidence, or evidence beyond a reasonable doubt. . . ." *Id.* at *11. See also, *Simpson v. Owens,* 207 Ariz. 261, 271, 85 P.3d 478, 488 (2004) (in which the court of appeals found that the quantum of proof required by the states falls into three categories: those requiring some variation of probable cause or a fair likelihood; those requiring some variation of clear and convincing or clear and strong evidence; and those requiring some variation of evidence beyond a reasonable doubt).

As noted by the Supreme Court in *Browne:* "Although articulating the standard in various ways, the overwhelming majority of states require evidence that is greater than probable cause but less than beyond a reasonable doubt. . . ." *Browne, supra* at *11.

"Such a position is consistent with the fact that '[t]he word "evident" is construed to mean manifest, plain, clear, obvious, apparent, and notorious, and unless it plainly, clearly, and obviously appears by the proof that the accused is guilty of a capital crime, bail should be allowed.' . . .

"Additionally a clear and convincing standard is appropriate because, if the term 'proof is evident or the presumption is great' is interpreted to require mere probable cause to believe that the defendant is guilty of first-degree murder, 'the guarantee would add nothing to the accused's rights, since a suspect may not be held without a showing of probable cause in any instance.' . . .

"A probable cause interpretation, adopted only by Maine, gives inadequate weight to a defendant's fundamental right to liberty and to the vital presumption of innocence. . . . On the other hand, requiring proof beyond a reasonable doubt at the pretrial bail stage of a criminal proceeding would also be imprudent. As the Rhode Island Supreme Court succinctly explained:

"Not only is it highly improbable that the framers intended the bail hearing to determine the precise question to be answered at the trial itself, but such duplication obviously wastes judicial resources and might prejudice a defendant's opportunity for a fair trial. If it becomes common practice to deny bail only after a judge has determined that the evidence produced at the bail hearing demonstrates guilt beyond a reasonable doubt, and the jury learns that a defendant has been denied bail, they may be highly predisposed to convict.

"*Fontaine* [*v. Mullen,* 117 R.I. 262,] 366 A.2d [1138,] 1142 [(R.I. 1976)]" *Browne,* 2008 WL 4132233 at *11-12. (citations omitted; footnotes omitted)

Citing *Commonwealth ex rel. Alberti v. Boyle,* 412 Pa. 398, 195 A.2d 97 (1963), the Supreme Court of the Virgin Islands identified Pennsylvania as one of the states that has adopted the majority position that the evidentiary standard for Article I, Section 14 requires something more than probable cause but less than beyond a reason-

able doubt. In *Alberti,* the Pennsylvania Supreme Court interpreted the words "when the proof is evident or presumption great" to mean that in order for bail to be appropriately denied, the Commonwealth's evidence presented at the bail hearing, together with all reasonable inferences therefrom, must be "sufficient in law to sustain a verdict of murder in the first degree." *Id.* at 400-401, 195 A.2d at 98. The court added:

"The practice followed in the present case and in a number of lower court cases of deciding this very important question on the basis of the testimony presented at a coroner's inquest is condemned and is no longer to be followed. In application for bail in a homicide case, a decision should be made on the basis of the testimony which is presented by the Commonwealth at that hearing, and, of course, under the pertinent tests hereinabove set forth." *Id.* at 401, 195 A.2d at 98.[26]

Thus, the court made a distinction between the Commonwealth's burden of proof at a preliminary hearing and at a bail hearing.

Eight years later, however, in *Commonwealth v. Farris,* 443 Pa. 251, 253, 278 A.2d 906, 906 (1971), the Supreme Court held that since evidence offered at a preliminary hearing established a prima facie case of murder in the first degree, the court properly denied bail

_____

26. Noting that there is no common-law, statutory or constitutional right to a preliminary hearing, our Supreme Court held in *Commonwealth ex rel. Walls v. Maroney,* 416 Pa. 290, 205 A.2d 862 (1965), that a defendant is not denied any of his constitutional rights because of the absence of a preliminary hearing, where there has been a coroner's inquest. *Id.* at 294, 205 A.2d at 864 (citing *Commowealth ex rel. Bandi v. Ashe,* 367 Pa. 234, 80 A.2d 62 (1951)). Thus, at the time of the *Alberti* decision, a coroner's inquest was the functional equivalent to a preliminary hearing.

pending trial.[27] Relying upon *Farris,* 13 years later, the Superior Court, in *Commonwealth v. Heiser,* 330 Pa. Super. 70, 72-73, 478 A.2d 1355, 1356 (1984), noted that the Commonwealth can satisfy its burden to prove that an accused is not entitled to bail by establishing a prima facie case of murder in the first degree. The Superior Court immediately followed this statement with a footnote which emphasized: "We caution that this statement should be considered limited to the facts of this case. . . ." *Id.* at 72 n.3, 478 A.2d at 1356 n.3.

More importantly, the court, immediately after citing to *Farris,* also cited to *Alberti,* preceded by the signal, "cf.," which "'[l]iterally means 'compare.'" *The Bluebook: A Uniform System of Citation,* §15.1.3 (Columbia Law Review Ass'n et al. eds., 17th ed. 2000). See *Commonwealth v. Chacker,* 320 Pa. Super. 402, 409 n.2, 467 A.2d 386, 390 n.2 (1983). "The citation's relevance will usually be clear to the reader only if it is explained. Parenthetical explanations . . ., however brief, are therefore strongly recommended" with the use of the signal "cf." *The Bluebook, supra.* The *Heiser* court, however, offered no explanation

---

27. In a one-page opinion, the Supreme Court held that orders by the trial court denying a 14-year-old defendant's motions requesting the court to quash the indictments and to return the case to the Family Court Division for disposition were interlocutory and unappealable. The appeal of the order denying bail was dispensed with by the court in just one sentence: "Since evidence offered at the preliminary hearing in the Family Court Division established a prima facie case of murder in the first degree, the court below did not err in refusing to release Farris on bail pending trial, and its order to this effect will be affirmed." *Farris, supra* at 253, 278 A.2d at 907. The court made this pronouncement without any reference to, or analysis of, the prior *Alberti* decision.

of the *Alberti* decision, nor did it analyze the "evident proof" standard set forth in Article 1, Section 14.

This latter authority,[28] without repudiating *Alberti,* suggests that once the Commonwealth has established a prima facie case of a non-bailable offense, sufficient "proof is evident" to trigger the prohibition of bail pursuant to Article I, Section 14. I must, however, agree with my colleague, the Honorable Steve P. Leskinen, from Fayette County, who, when interpreting the "evident proof and presumption great" language noted that the prima facie standard identified in *Farris* and *Heiser* is lower than the one announced by the Supreme Court in *Alberti.* In *Commonwealth v. Hamborsky,* 75 D.&C.4th 505 (Fayette Cty. 2005), Judge Leskinen opined:

"Under such a reading, the common pleas court would have no decision at all to make on bail. If a defendant was charged with first- or second-degree murder, and the district justice found sufficient evidence to bind the case for trial, bail would automatically be prohibited. Such an interpretation makes much of Article I, Section 14 mere surplusage. . . . A close reading of *Alberti* reveals, however, that the Supreme Court specifically made bail depend upon: 'evidence which is presented at the bail hearing. . . .' A separate bail hearing is necessary because potential defenses are not considered at a preliminary hearing. Preliminary hearings address the mere sufficiency of the Commonwealth's evidence, while the Eighth Amendment

---

28. Each of the cases referred to above considered the availability of bail to one accused of first-degree murder prior to the 1998 constitutional amendment to Article I, Section 14. Prior to the amendment, the Constitution limited its prohibition of bail to those charged with capital offenses. This distinction has no affect on the court's interpretation of the language at issue.

to the United States Constitution requires that bail be based on the likelihood of conviction, and how that bears on the likelihood of flight." *Id.* at 515-16.

It appears that the appellate courts' use of the words "prima facie" in *Farris* and *Heiser* has blurred the distinction between preliminary hearings and bail hearings. I must also agree with the reasoning found in *Browne, Simpson,* and a myriad of other court decisions from around the country that the language "proof is evident or the presumption great" means something more than prima facie evidence, for to read it in this manner would do nothing to advance the constitutional rights of the accused, since a suspect may not be held without a showing of prima facie evidence in any case.[29] See *Browne,* 2008 WL 4132233 at *11; *Simpson, supra* at 271-72, 85 P.3d at 488-89; *Fontaine, supra,* 366 A.2d at 1141.

Having determined, in accordance with *Alberti,* that the evidentiary standard is something more than a prima facie showing, I must analyze the precise meaning of the phrase, "proof is evident or presumption great." First, it is clear under Pennsylvania law that courts must give the terms of a statute their "commonly accepted meaning." 1 Pa.C.S. §1903(a); see *e.g., Commonwealth v. Cameron,* 247 Pa. Super. 435, 440, 372 A.2d 904, 907 (1977) (quoting *Commonwealth v. Bristow,* 185 Pa. Super. 448, 138 A.2d 156 (1958)). Section 1903(a) unequivocally states that "[w]ords and phrases shall be construed . . . according to their common and approved usage."

The word "evident" is defined by the Oxford English Dictionary (1989) as "[c]lear to the understanding or

---

29. The prima facie standard is sufficient to detain the accused yet consistent with the presumption of the accused's innocence. *McBride, supra* at 157-58, 595 A.2d at 591.

judgement; obvious, plain" and "[i]ndubitable, certain, conclusive." *Id.* at 470. Webster's New Universal Unabridged Dictionary (2nd ed. 1983) defines "evident" as "visible, clear, out and plain; easy to see or perceive; apparent." *Id.* at 634. Synonyms for "evident" are "plain, visible, conspicuous, manifest, obvious, clear, palpable, apparent, discernible." *Id.*

Based upon the above, the plain language of the evident proof standard in Article I, Section 14 suggests a "clear and convincing" standard. This standard has been described as "an 'intermediate' test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt." *Commonwealth v. Meals,* 590 Pa. 110, 120, 912 A.2d 213, 219 (2006). The "clear and convincing" standard requires evidence that is "so clear, direct, weighty, and convincing that the trier of fact could come to a clear conviction, without hesitating, concerning the facts at issue." *Commonwealth v. Feucht,* 955 A.2d 377, 380 (Pa. Super. 2008). This heightened standard of proof provides significant protection to the accused before bail is denied. I must, therefore, make a determination of whether there is clear and convincing proof that defendant O'Shea-Woomer committed first-degree murder.

In the present case, since poisoning by lethal dose of morphine can be an intentional killing, and specific intent can be inferred by the use of a deadly weapon on a vital part of the human body (*i.e.,* a lethal dose of morphine), the Commonwealth has introduced substantial evidence as clear and convincing proof of specific intent, which could result in the jury finding defendant guilty of first-degree murder. This evidence, were it to be believed, establishes not only a prima facie case of first-degree

murder for purposes of the habeas corpus petition, but also rises to the required level of clear and convincing proof for purposes of the analysis for the bail petition.

I hasten to note that while this "evident proof" standard is sufficient at this stage of the proceeding to deny defendant bail, it is not sufficient to convict her at trial. Thus, in making this decision, I am expressing no opinion on the outcome of this case, inasmuch as this standard will not apply at trial.

### III. CONCLUSION

For the reasons stated above, the expert report of Dr. Middleberg will be admitted as evidence for purposes of the present petitions. The totality of the evidence presented at the preliminary hearing and the habeas corpus/bail hearing established a prima facie case for the charges of criminal homicide, drug delivery resulting in death, and delivery of a controlled substance. Therefore, the habeas corpus petition will be denied.

For the reasons set forth above, the Commonwealth has established that the "proof is evident or presumption great" that defendant may be convicted of first-degree murder, which results in a maximum sentence of life imprisonment. Therefore, defendant's petition for bail must be denied.

Accordingly, I enter the following:

### ORDER

AND NOW, March 10, 2009, upon consideration of defendant's petitions for writ of habeas corpus and for bail, the Commonwealth's responses thereto, the briefs filed by the parties, and oral argument of counsel, it is hereby ordered that said petitions are denied.